Robert George DRUMMOND and Mildred Pauline Drummond, Plaintiffs-Appellants,

v.

FULTON COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, et al., etc., Defendants-Appellees.

No. 76–1888.

United States Court of Appeals, Fifth Circuit.

Feb. 2, 1977.

Dissenting Opinion Feb. 11, 1977.

Rehearing En Banc Granted March 28, 1977.

See also, 5 Cir., 532 F.2d 1001.

Margie Pitts Hames, Neil Bradley, Atlanta, Ga., for plaintiffs-appellants.

Robert L. Mote, Daniel S. Reinhardt, Atlanta, Ga., for defendants-appellees.

Alan R. Turem, Atlanta, Ga. (Court-appointed not under the Act), Andrew R. Kirschner, Atlanta, Ga., special counsel for interest of Child Timmy.

Before TUTTLE, GOLDBERG and RONEY, Circuit Judges.

TUTTLE, Circuit Judge:

This appeal presents the question whether the federal courts can give relief to white foster parents who contend that they have been unconstitutionally denied by Georgia state officials the right to adopt a mixed race child solely on account of race. Neither the trial court nor this Court has the desire nor the authority to second-guess the Department of Family and Children Services on the fitness or suitability of anyone as adoptive parents. Our jurisdiction permits us only to ascertain whether in the adoption process the state has deprived the plaintiffs of a protectable interest under the Fourteenth Amendment without procedural due process or has denied them equal protection of the laws as guaranteed by the Fourteenth Amendment.

## I. FACTUAL OUTLINE

The record before us, while very sketchy because of the fact that the trial court plainly considered it to be to the best interests of all concerned to keep the hearing on preliminary and permanent injunction narrowly restricted,[1] nevertheless discloses the following facts:

The child, Timothy, known throughout as Timmy, was born out of wedlock on November 17, 1973 to a white mother by a black father. After one month in the care of his natural mother, he was taken into the care of the defendant Fulton County Department of Family and Children Services under the authority of Georgia law because of the "unfitness" of the mother. On December 15, when he was less than one month old, he was placed in the home of Robert and Mildred Drummond, the plaintiffs, as foster parents. At this time, Mrs. Drummond was 49 or 50 years old and her husband was 37 or 38 (the record does not show their birthdates but at the time of the action by the defendants here complained of, they were 51 and 39 respectively.)

For 15 months, until March 10, 1975, the Drummonds cared for Timmy in their home as a child of their own in a manner subsequently described by the caseworkers and supervisors, both foster home and adoption personnel, as "excellent," "loving," "extremely competent" so that at that time he was described by such personnel as "an extremely bright, highly verbal, outgoing 15-month-old baby boy."

Home visits by foster home caseworkers were infrequent, but some contact was maintained by telephone, especially when the Drummonds desired to leave town for trips. Some time late in 1974, it came to the attention of the then current caseworker Barbara Osgood, that the Drummonds wished to adopt Timmy. She had not then seen Timmy or the Drummonds, but the problem of the Drummonds' request was submitted to a "staffing." This was a conference which included Osgood's supervisor, Mrs. Grape, Mrs. Dallinger, the adoption supervisor, and one or two other personnel. It is apparent that none of these staff people had seen either Timmy or the Drummonds. Miss Osgood's description of what occurred at the staffing follows:

"A. Well, it centered around the fact that we knew the Drummonds would like to adopt Timmy, and Miss Grape talked a great deal of time about she was black and she talked a great deal of the time about experience that she had known or heard of of black or mixed race children growing up in white homes. And she had, you know, some real feelings that this

---

1. The hearing, by order dated January 14, 1976, was set down for January 23 on a motion for preliminary injunction. Following abbreviated discovery by interrogatories and depositions, the trial court on June 23, when the hearing commenced, stated that the case would be considered on the merits. Both parties stated that they had insufficient time, but they may have waived any objection to the order of consolidation. On appeal the appellants, plaintiffs below, claim that they are entitled to a reversal of the order of dismissal on the merits because of inadequate notice and time for preparation for a consolidation under Rule 65(A)(2) F.R.C.P. In light of the disposition we make of the case, we need not reach this contention.

was not a good plan to *this type* of child, that they face too many problems as a result of *that kind* of placement.

So after, you know, some discussion was made about that, the decision was made for Miss Grape and Miss Dallinger to talk with the Drummonds and to try to express, you know, some of our concerns about what we felt was in Timmy's best interest; and, also, the question was brought up that if the Drummonds *were not amenable to our plan*, would we move Timmy to a black foster home feeling that, you know, it would be better if we were going to have him adopted by a black couple, to have him in a black foster home if they was going to be any length of time before he was free.

Q. Was there a decision made at that staffing that you recall? Was there a vote taken in any way?

A. No. There was no vote taken. I think I commented at the time that it seemed to me that the decision had already been made.

Q. What do you feel the decision was?

A. I think the decision was that it would be in Timmy's best interest to be adopted by a black couple." (Emphasis added.)

On March 10, Mrs. Grape and Mrs. Dallinger had the Drummonds bring Timmy to the office to carry out the decision made at the "staffing." Mr. Drummond testified that at the conference: "Mrs. Grape said she thought Timmy should be adopted by a black family." The following testimony then followed:

"Q. What did you say when you were told that Miss Grape, by Miss Grape, that she thought it would be best for Timmy to be placed with a black couple?

THE COURT: Black couple?

MRS. HAMES: Sir?

THE COURT: What did you say?

BY MRS. HAMES:

Q. Black couple. Is that the terminology they used, or black family or black parents?

A. Black family, I believe.

Q. What was your response to that?

A. Well, my wife and myself thought that we should be able to adopt Timmy, that we would like to have him.

Q. All right, Was there anything said about it being to his advantage for him to grow up in the black community?

A. I think Miss Grape said something to that effect.

Q. Did you and your wife ever accept the fact that you couldn't adopt Timmy, that he had to be adopted by black parents?

A. No, we did not.

Q. Did you ever do anything about it after you were told—this March meeting, what did you do after that, toward adopting Timmy?

A. Well, we told them we would like to adopt him and told the case worker."

Mrs. Drummond's testimony as to this interview was as follows:

"Q. Okay. What did they tell you about whether they were going to permit you to adopt him?

A. They told us that—Miss Grape did the talking, and Miss Grape said that since Timmy was a mixed child, that she felt, and she felt that the Department felt, that Timmy would be better off raised in a black family.

Q. Did you accept that at that time?

A. I tried to accept it. But I could not.

Q. What further steps did you take to try to adopt Timmy?

A. I called and talked with the case workers and repeatedly told them that we wanted to adopt Timmy. And then when Mrs. Osgood came out to our home, we told her how much we wanted to adopt Timmy and would they please give us an-

other meeting, that we would try and let them know how much we wanted Timmy.

Q. Okay. Back up to the March meeting. Were you told at that meeting that you were too old to adopt him?

A. No.

Q. When did you move to Douglas County?

A. Within eight months.

Q. Did anyone ever tell you it would hurt your chances to adopt Timmy if you moved to Douglas County?

A. No, Ma'am.

Q. Would you have moved to Douglas County had you known?

A. No, indeed, had we known.

Q. Are you willing to return to the City of Atlanta?

A. We're packing to move back to Fulton County to the City of Atlanta now.

Q. In the March meeting, did Miss Dallinger or Miss Grape discuss the community in which they thought Timmy should live?

A. They told us that they felt that he would be—Miss Grape stated that she felt that he would be better off raised in a black community."

A memorandum for the files was prepared by Mrs. Grape as follows:

"On 3/10/75 Mr. and Mrs. Drummond, foster parents, were in the office with Timothy Hill, foster child. Nancy Hartzog kept Timothy in the playroom while Helen Grape and Kay Dallinger had a personal conference with Mr. and Mrs. Drummond. The Drummonds now admit that Timothy is a mixed race child of Black/White heritage. They did some superficial denial of the idea that this fact would cause Timothy any problems in remaining in their home. They did not, however, push for them to be allowed to adopt Timothy. As a matter of fact, they stated they could let Timothy go to a young, energetic, religious, *adoptive* couple. They expressed primary concern that he not be moved from their home to another *foster* home as they be-

lieved he would not receive the quality of care they are giving him in another foster home. They feel that separation from Timothy will tear their hearts out but that they can do it because it would be best for Timothy in the long run. They seem quite accepting when Ms. Grape and Ms. Dallinger verbalized for them that Timothy would, in our opinion, make a better adjustment and have a better chance in life with a Black couple in the Black community.

We further explained our efforts to work with the natural mother, the expected time involved before we could get either a voluntary release or be prepared for court action to terminate parental rights. We said the mother was not a bad person but a sad person—immature not ready for responsibility. We stated we needed to make further efforts to rehabilitate her before a final decision is reached. We estimated a minimum of six months to one year before we will even know if adoption is the plan for Timothy. Ms. Dallinger explained that even the ( ) months more would be involved in working with him to fully know Timothy, select the right adoptive home, and slowly move Timothy. Ms. Drummond cried in anticipation of eventual separation. Both Mr. and Mrs. Drummond expressed appreciation in knowing the truth. The truth being 1) we are working towards adoption for Timothy outside their home; 2) it may take one to two years to accomplish this goal; 3) the rehabilitation of the mother's home is a slim possibility but still a possibility; 4) because of the excellent care the Drummonds have provided for Timothy, we (the agency) are more than willing for the Drummonds to keep Timothy on a foster care basis until a permanent plan can be made if the Drummonds are willing to keep him under these circumstances. The Drummonds committed themselves to giving the child all the love and care they can give him as foster parents and to eventually helping Timothy to separate from them and move to a permanent adoptive

home. They reemphasized that they could 'love and let go.'

*ADDITIONAL NOTE*: We agreed to keep them informed of any progress that we make in working with the natural mother or in court action. Ms. Grape suggested 11/75 as a good review date since Timothy will be two years old that month. Timothy was observed on this date to be an extremely bright, highly verbal, outgoing, 15 month old baby boy. His complexion is light olive. He has a definite Afro and is a physically appealing mixed race child." (Emphasis in original)

A letter was then sent to the Drummonds which is copied here verbatim:

"March 17, 1975

Mr. and Mrs. Robert Drummond
2390 Fabin Street, N.W.
Atlanta, Georgia 30318

Dear Mr. and Mrs. Drummond:

This is to confirm with you our understandings and agreements during our office conference on 3/10/75. As you will recall, on this date we explained our efforts to work with Timothy's natural mother and the time involved before we could get either a voluntary release or be prepared for court action to terminate parental rights. However, we also explained that we would continue further efforts to rehabilitate Timothy's natural mother before a final decision was made. The estimated time span would be approximately six months to one year before this decision would be reached. If adoption becomes legally possible, months will be involved in working with you, fully knowing Timothy, selecting the right adoptive home, and slowly moving Timothy into a permanent adoptive home.

Both of you expressed appreciation in knowing specific steps that the department would take in working with Timothy. These steps are:

1) we are working towards adoption for Timothy outside your home;

2) it may take one to two years to accomplish this goal;

3) the rehabilitation of the mother's home is a slim possibility but still a possibility;

4) because of the excellent care you have provided for Timothy, the agency is happy for you to keep Timothy on a foster care basis until a permanent plan can be made, if you are willing to keep him under these circumstances, and you stated in our meeting that you wanted to keep him until a permanent plan could be made.

You committed yourselves to giving Timothy all the love and care that you could give him as his foster parents and also eventually to helping Timothy to separate from you and move into a permanent adoptive home. Thank you for your love and concern for this precious child.

> Sincerely,
> Ms. Kay Dallinger
> Casework Supervisor III—Adoptions
> Mrs. Helen Grape
> Casework Supervisor III—Foster Care"

Mrs. Drummond testified that they continued to make known to their caseworker thereafter their desire to adopt Timmy. This is confirmed by Mrs. Osgood, their caseworker, who testified:

"A. After I read this [the memorandum of March 11, *supra* ] I thought, well, that perhaps things had been resolved with the Drummonds and that it appeared that they were in agreement with us. So I went out to do the foster home re-evaluation interview thinking this was decided and that they would have, you know, have been in agreement with this plan for Timmy. I was really surprised when I got out there, because to hear their interpretation of it, that they were not in agreement with it at all.

And, you know, I don't know whether it is because they had changed their minds in the interim

period or whether we had heard what we wanted to hear in the interview, but at any rate, they certainly were not in agreement with what this states when I went out there.

Q. What did they want to do when you went out there? What was their opinion? What was their approach to you?

A. Well, they had stated that they had been talking with their foster care worker who was Mollie Bartlett at that time and were requesting an interview with the adoption staff to, again, state their desire to adopt Timmy.

Mrs. Drummond said she had not heard anything about it, and so I told her after I wrote up my evaluation that I would write a memo to Mrs. Dallinger bringing it to her attention that the Drummonds were still interested. I did that soon after the evaluation.

Q. Go ahead.

A. I received a reply stating that the Drummonds would be given an interview after Timmy's termination hearing."

On August 15 Miss Mollie Bartlett wrote a memorandum to Mrs. Dallinger as follows:

"On 3–10–75, you met with Mrs. Grape and the Robert Drummonds, Timmy's foster family. At the conclusion of the conference the Drummonds were planning to care for Timmy until he was freed for adoption and to help him adjust to the adoptive home when adoption occurred. For a short time they seemed to fully accept the premise that Timmy would be better placed in a black home.

Today, after nearly six months, the Drummonds are requesting an opportunity to be reconsidered as adoptive parents for Timmy. They have no reservations about their acceptance of a mixed race child. Mrs. Drummond's health had once seemed questionable, but her doctor found gallstones and as soon as she has surgery, she foresees no further health problems."

Mrs. Dallinger replied:

"In response to your memo regarding the Drummonds' renewed interest in adopting Timmy, I have learned that the termination petition has been filed and the hearing set for 9/25/75 at 9:30. Under the circumstances the Drummonds should bring Timmy to the *office* for the hearing, and you should bring him to the juvenile court.

I personally feel that the Drummonds are back into their earlier denial pattern. The approach I recommend for you is to stall with no encouragement. Example . . . 'No one can be considered for the adoption of Timmy until he is freed. Adoption staff would have to carefully examine any possible home for Timmy, particularly a white home such as yours. I don't want to encourage you. The best thing for you to do is think about this some more and discuss this with the adoption staff. If and when he is freed, I have advised adoption that you have changed your mind.'

Thank you for alerting us to the situation." (Emphasis in original).

Thereafter, about August 25, Mrs. Osgood made the re-evaluation as a result of which she described the foster parents in the following terms:

"The foster parents provide excellent care. They are unusually attentive to the child's medical and emotional needs and feel as if they are the 'natural' family."

Under the heading on the evaluation form "Particular Strength of Home," Mrs. Osgood wrote:

"The Drummonds have accepted a mixed race child and have handled the attendant problems well. They are a very loving, warm family."

Finally, she made the following recommendation for the Drummonds as foster parents: "I recommend this home for a child of either sex, age 0 to 3."

This re-evaluation report was accompanied by a memorandum again addressed to Mrs. Dallinger:

"I recently did the foster home re-evaluation on the above named couple As you will recall on March 11, 1975, you and Helen Grape interviewed Mr. and Mrs. Drummond regarding their expressed interest in adopting Timmy. For your convenience a copy of the notes from that conference are attached.

I spoke with Mr. and Mrs. Drummond for over two hours and during this time I also had a chance to observe Timmy. As a result of my conversation I have the distinct impression that the Drummonds did not adequately express their feelings on the March 11th interview. In the foster home re-evaluation they stated unequivocally and emphatically their desire to adopt Timmy. They rejected the notion that he would make a better adjustment in a Black home by pointing out that Timmy has always been around White people and this has been incorporated into his self-concept. They do not understand why we would remove a child from a home where he has been since birth and replace him because we believe he will have a better 'chance' in the Black community.

The Drummonds expressed their intention to give Timmy every opportunity possible to develop as a human being, regardless of race. I talked with them about community acceptance and the possibility of Timmy dating a Black girl when he gets older. The Drummonds acknowledged that Timmy would be 'different,' but felt he would have problems in the Black community also. They noted that Timmy would make his own decisions as to who he would date and they would have no objections to his choice. They pointed out that they make no secret of Timmy's Black heritage and felt that they would deal forthrightly with Timmy on this subject.

Timmy is an exceptionally well-adjusted child. There is no question that he is the center of this household. He talks in sentences, counts to ten, and shows off for visitors by strumming the guitar and singing gospel songs. The fact that he is bright, active, and friendly is a tribute to the excellent care he is receiving from these parents.

Because of the intensity of their feelings for Timmy, the Drummonds are again requesting a conference with you to discuss adoption. I believe they will explore every possibility in their efforts to keep Timmy first within the agency, but using outside resources if it becomes necessary.

I hope this information will be helpful. I understand Timmy's termination hearing is set for September 25th, 1975."

To this memo Mrs. Dallinger replied:

"Thank you for your memo of 9/3/75 concerning this case. I have discussed the case with Ms. Staten. We feel it is inappropriate to decide the matter prior to termination proceedings on 9/25/75. I will throw the issue open to the adoption committee at the end of September, if he is freed. Regardless of any decisions made, you may assure the Drummonds that they will be given further interviews with me or other adoption staff about this matter. Early October would appear to be the best time for this and I will see that they are contacted. Please loan me any case files you have on the Drummonds."

On September 25, the Juvenile Court of Fulton County entered what is known as a "Termination Order," ending the parental rights of Timmy's natural mother and placing his custody in the Georgia Department of Human Resources, Division of Family and Children Services, granting the Division the right to place Timmy for adoption.

Thereupon, on October 3 a "Social Study on Child to be Placed" was made for Timmy. It was made by an adoptions caseworker named Phyllis Jonas. This study described the child as having "medium olive" skin, "dark brown," "thick rather coarse and wavy hair" and as being a "very attractive child," normal physically and mentally, stating "child is well adjusted and happy. He is a bright verbal child."

This study was followed by an "evaluation interview" by caseworker Brenda B. Payne. Her report, which contained a recommendation that the Drummonds be permitted to adopt Timmy, is quoted in full:

"Mr. and Mrs. Drummond arrived early for their interview. They brought Timmy with them. He continues to be an extremely alert, happy and attractive child. While I interviewed the Drummonds, Mrs. Holloway, Timmy's worker care[d] for him in the playroom. The Drummonds were obviously very nervous and anxious at first.

Initially I reviewed the past events with them, their meeting with Mrs. Dallinger and Mrs. Grape, the decision made at that time, and their change of heart later. As Ms. Hauben's contacts indicated, the Drummonds have had a chance to think about their interview last spring, and have come to the conclusion that adoption by another couple may not be what is best for Timmy.

The Drummond's expressed their feelings that although everyone wants to do 'what's best for Timmy' on re-considering they seriously wonder if placing him in another home, and putting him through the trauma of a move would be in his best interest. The agency seems to be saying that putting him in a black home would be the prime consideration thinking 'what's best for Timmy.' The Drummond's stated they felt they knew Timmy better than any agency personnel, they've cared for him, watched him grow and develop, and perhaps they know best what would be best for him.

I told the Drummonds that part of my functions was to sit down with them and think together what would be best for Timmy—that frankly none of us were really sure of what would be best at this point. I spent a good deal of time in finding out about the Drummond's orientation toward blacks and the black community. Although the Drummond's admitted to having some degree of racial prejudice in long years past, due to their age and society's focus (?) they felt that their ( ) had change[d] every year before getting Timmy. Mr. Drummond states he's had lots of relationships with blacks thru his job, and has worked under a black supervisor.

He spoke in positive terms of these relationships. Mrs. Drummond said she had worked as a nurse several years ago and had worked closely with many black people and she also said that with their contacts with people in the gospel singing world, many more blacks were involved as musicians and performers than in years past. They had worked closely with many black performers and seen [sic] able to form very good relationships with them.

Although there are no blacks living in their area in Douglasville, Mr. Drummond remarked that they live in a subdivision with many young families. He stated they had never had any problems with Timmy's being accepted by the neighbors, and seemed to feel that the young adults of today are much more accepting of people of other races. The Drummond's indicated that Timmy had been enrolled in an integrated kindergarten setting, but Mrs. Drummond was advised to take him out for awhile by Timmy's doctor due to his bouts with tonsillitis. The public school nearby is integrated; however, the majority of the children who attend are white.

We talked some about whether or not Timmy understand[s] he's different yet. They said that he's really too young to yet be aware that he is, but as he gets older they certainly will try to be as open with him as they can about his heritage and race. (According to Ms. Holloway with her contacts with Timmy it is evident he's not yet aware of any colors yet and cannot identify by name colors like red or green, or cannot say what color he is).

Although Timmy has not yet noticed that he is different Mr. and Mrs. Drummond were certainly able to acknowledge that other people have noticed. They are aware that Timmy will be noticed and are aware they will have to help him through many hard times in his life. Mrs. Drummond said she knows they will have to handle people reactions to Timmy; they certainly don't deny they've already had to handle stares and comments from people of both races.

Mr. Drummond said people of both races. Mr. Drummond says people stop and ask what nationality he is and he tells them. He says he wants Timmy to be proud of the fact that he is part black. Mr. and Mrs. Drummond both said that although they've [sic] certain Timmy may face ridicule or rejection at times, they feel if he has their love and support, as well as his gift of openness, friendliness, and very high intelligence, that this would enable him to have a happy and secure life. Mrs. Drummond expressed her belief that ( ) was responsible for making Timmy such an exceptionally gifted and friendly child, so that in spite of problems about his race he will be liked and accepted by those who come to know him personally.

The Drummonds are very much aware of Timmy's exceptional mental abilities. They definitely plan to send him to college if he wants to go, and stated they hoped maybe he would want to be a professional person such as a doctor or lawyer. I feel they recognize that he may need much more stimulation as he gets older, and seemed willing to consider outside resources, special schools or tutors in order to help him reach his potential.

When we talked in detail about some of the specific problems Timmy might face because of his race, Mrs. Drummond reacted in a strongly protective manner. She said if she ever heard of a teacher or anyone else giving him trouble because of his race, she'd 'go down there and give them a piece of my mind.' I tried to help them see that while it would be good to support Timmy during these times that if they're over protective they wouldn't give Timmy the chance to become independent and able to stand up for himself. I noted, that one of the advantages Timmy would have in a black home would be that he would be given survival skills, would be given guidance from people of the black race as to how to protect himself and win difficult situations. It would be much easier for a black parent to give him these skills than would a white parent, as they would be teaching him from their own experience.

Although the Drummond's understood what I was saying, they felt that the most important thing Timmy needed to be secure and happy about himself, was to have parents who truly loved him.

We talked about how the rest of the Drummond's extended family felt about Timmy. The Drummond's said that all of their family, their brothers and sisters, and Mrs. Drummond['s] mother dearly loved Timmy. Mr. Drummond's parents are deceased. Mrs. Drummond said her mother called her before our meeting today to say she'd be 'waiting by the phone to hear the results.' Evidently the whole family is behind the Drummonds 100% and Timmy is fully accepted by them all.

I spent a lot of time in talking with the Drummonds about things they might have to face with Timmy—the social pressures, the feelings of insecurity he might have, and especially problems which might arise during adolescence in regard to dating and peer group relationships. I gave them true case examples from articles I'd read about blacks raised in white homes, although I did have to admit there were both very negative and positive experiences these children had. The pros and cons were about equal in those situations. I showed the Drummonds pictures of our foster child Jackie who is a mixed race five years old, showing how much he had darkened over the years.

As I expected, none of these things seemed to change the Drummonds mind. They felt they love Timmy now and will always love him regardless of what color he becomes or what culture he wants to identify with. They indicated that the agency thought they were good enough to raise Timmy up till now, so on what basis other than race were we unwilling to consider them as adoptive parents. Mr. and Mrs. Drummond were not hostile, toward this agency, but they again stated they felt that the fact that they loved Timmy and he loved them was the most important thing for the agency to consider.

I tried to discover how far the Drummonds would be willing to prepare themselves should they be allowed to raise Tim-

my. They would be willing to do anything we suggested to go through a series of intensive interviews with black caseworker to help them understand the black culture and heritage, to read books and other literature in order to educate themselves in the black experience, and to talk with their own black friends at work about their feelings and experiences about being black. They were extremely cooperative and seemed willing to accept any help we could give them. They were very interested in hearing about the Buechle couple and would be very interested in being put in touch with them.

At the present time our relationship with the Drummonds remains good. They are not hostile or angry and are very willing to accept supervision or guidance from us. However, they did make it clear they loved Timmy enough to fight for him and would take the matter to court if necessary. I do fear if this result[s], and the Drummond's win in court we would have damaged any chance we would have to give them guidance and help in raising Timmy, as our relationship with them would most probably be destroyed. They are pushing for a decision to be made soon. Mrs. Drummond says this situation has caused them lots of worry and heartache; she said Timmy is at a crucial period in his life, and he needs to be given some security, instead of living under this threat of removal. The Drummonds understand the decision is not mine to make, that it will be a committee decision, they do ask that this matter be resolved soon for everyone's sake. I told the Drummonds they would be notified of our decision as soon as possible.

*Observation and Recommendations:*

In thinking about the agency's position in this case I still can see it remains a two-sided thing. In my brief contact with this family I have both positive and negative feelings as have other workers.

I was concerned about how intensely the Drummonds relate to Timmy; it turns me off a little to see them getting him to 'perform or do tricks.' The reasons for this may be positive or negative—he may be a novelty or toy for them, or they may just be over-emphasizing his achievements and getting him to perform to prove to caseworkers they are taking good care of him and stimulating him. I don't know what may be the cause, but I definitely hope this pattern would not continue as he grows up. I also understand from other workers that Mrs. Drummond has an almost hypochondriac focus on Timmy's health. There definitely is a fear he could be pampered, spoiled and over protected by them.

Also, on considering the Drummonds age and background, it does seem their attempts to help Timmy understand his black heritage will be admittedly artificial though sincere and honest in motivation. Whether or not the Drummonds can become comfortable with the subject of race over the years, so that their attempts will be natural and spontaneous is anybody's guess.

I also am very much aware that in intellect and intelligence Timmy is far above the Drummonds. Although they can offer adequate stimulation now, who is to say how much they'll be able to stimulate Timmy as he grows up. Certainly to 'waste' his intelligence would be a shame, although if he develops a trauma because of being moved he could become a very intelligent culture but perhaps insecure and unhappy individual.

On the positive side I can definitely see that Timmy is loved by the Drummonds, and he loves them. They do not seem to have tried to 'hide Timmy' and are constantly taking him to public places, gospel shows etc. They seem to have so far instilled in him a good feeling about himself and he seems happy and well adjusted. So far they seems [sic] able to deal with his racial identity in an acceptable manner. The Drummonds do have more involvement with blacks than we had first thought, and do seem to be in the early stages of developing healthy attitudes about black people.

The fact that their other family members are supporting them about Timmy is also a positive.

Because the Drummonds are not from the kind of upper-middle class achievement oriented home most caseworkers come from it does make it hard to visualize seeing Timmy grow up 'successfully' in this kind of culture. However who really can say what kind of environment is best to grow up in?

In conclusion, I personally feel for several reasons we should let Timmy remain with the Drummond's, in spite of our concerns. Either way there are risks and no guarantees. The fact that there presently are no appropriate homes for Timmy, and the fact that he might also experience some rejection by some members of the black community due to his 'whiteness' is also a consideration. Also my concern that we most probably would be facing court action by the Drummonds with some doubt as to the 'strength of our case' is also a factor. For Timmy's well being I do not feel that a long court involvement would be beneficial regardless of what the courts decision is. The Drummonds are evidently living under a great deal of stress and eventually this may be transferred on to Timmy.

I do feel that a group consensus, is probably the best way to decide what to do. This certainly is too risky a situation for any one person to make the decision alone. I hope the group will be able to meet and decide some thing soon."

Acting on Mrs. Payne's recommendation, a group was called on November 11 to conduct a "staffing," which is apparently a word of art to describe a discussion by staff personnel who presumably are experienced in the area of concern. Of the 19 persons present at the staffing the record does not indicate that more than four had seen Timmy or the Drummond family. Of the six or seven caseworkers and supervisors who had seen the child and his foster parents, it appears that Mrs. Grape, Mollie Bartlett, and Barbara Osgood were not present at the staffing. The record does not clearly establish the precise time, place or form of the final action which the defendant De-

partment or its officials took that denied the Drummonds' request to adopt the child. Neither does it show precisely what authority any one of the participating staff persons had to make the final decision. It appears that the officials treated the vote taken at the staffing as representing final denial of the Drummonds' request. In any event, Mrs. Drummond testified that a few days after the staffing, she and her husband were called to the office and met with Mrs. Dallinger and Mrs. Holloway and that the former said to them: "I am sure that you are both very anxious to know what has happened and we called you in to tell you that the *decision still stands*, that we feel that Timmy will be better off adopted by a black couple or a black family." [2] (Emphasis added.)

At the trial, during her testimony, Mrs. Dallinger gave a different interpretation of the March conversation, saying that the reference to black family was to indicate that it would be more likely that a black adoptive home would be available. Her testimony follows:

"Q. Actually, you had made a tentative decision at the March meeting to place him in a black home if you gained the parental rights?

A. I thought that would be the likelihood of the home that would be available, but even all the way through after the final decision was made when I asked the State for homes, I did not ask for black homes. I asked for whatever homes were available for this child.

Q. Reading again from your testimony in your deposition on page twenty-six, 'So there had been a request to adopt that you know'—talking about the Drummond—'is that right? And the request had been made in spite of your knowledge of his mixed race, of his being a mixed race child?

A. That's right.

**2.** Apparently the only "decision" to which reference could be made was the decision made at the March 11 staffing which, it will be remembered, preceded the first meeting between Mrs. Dallinger and Mrs. Grape with the Drummonds.

Q. Did you verbalize an opinions that he would be better, make a better adjustment and have a better life with a black couple in the black community?

A. Yes, I did.

Q. Did Miss Grape verbalize that?

A. Yes.

Q. Actually, you had made a tentative decision at that time to place him in a black home if you gained—had his parental rights terminated; is that correct?

A. That's right.'

Q. Did you make that—

A. That was a tentative decision that he would go into what we thought would be probably a black home. You have to understand the supplies of homes that are available."

Mrs. Dallinger testified further about the November meeting:

"Q. . . . In the November meeting did you tell Mr. and Mrs. Drummond that the decision had been made to place Timmy in a black home?

A. Yes, because then we had made the final decision that they could not adopt, and *we had then selected the home, so, yes, we knew the home then.*

Q. Did you have the—

A. That was definite then.

Q. At the time you told them?

A. Uh huh. In November. *I told the characteristics about the home that had been selected,* you know, that I thought maybe would help them realize Timmy was going to go to a good home.

Q. At the time I'm talking about, maybe, the staff meeting, the decision was made there to place Timmy in a black home.

A. In the staffing meeting?

Q. In the staffing meeting.

A. *No. We didn't decide where to place Timmy.* We decided that we would place him for adoption out-side of their home. We were trying to make a decision in that meeting whether it would be in Timmy's best interest to leave him with the Drummonds and allow them to adopt him or place him up for adoption outside, to seek adoptive homes outside of, you know, of them.

Q. Did you not decide at that meeting that Timmy would be placed in a black adoptive home?

A. No. I don't believe so. I think we talked about, again, in terms of the supply, we thought that was proba-bly what would be available.

THE COURT: Show her this last para-graph.

[The last paragraph reads: 'A vote was taken and it was a group decision that it would not be in Timmy's best interest to leave him in the Drummond home, and that we would begin immediately to look for an appropriate black adoptive home. Although this was a difficult decision it was felt that Timmy's long range best interest must be the focus.']

BY MRS. HAMES:

Q. Referring to Plaintiff's Exhibit 15, the discussion of race, I would ask, that purports to be notes from that meeting, and I ask if that correctly sets forth the decision?

A. These are not my notes. That may have been the understanding of the person that wrote these notes.

Q. So you are denying that now?

A. Huh?

Q. You are denying that the decision was made at that meeting to place Timmy in a black home?

A. We talked in that meeting about mixed children and where they seem to adjust better and what kind of black couple—what kind of a white couple could accept these chil-dren, you know, what were the characteristics of those couples. I think our general feeling, you know, at the end of that meeting that it would likely be a black home, you

know, available for him that would fit those requirements, but like I said, you have to understand the procedure. After we rule out one home, then we look at the pool of homes available, and we look at all homes available. But in the minds of all of us at the meeting—

Q. Did you have a black home available?

MR. MOTE: Your Honor, I think she was in the middle of her answer.

THE COURT: Did you complete your answer?

MRS. HAMES: I'm sorry . ..

THE WITNESS: What did I start to say?

MR. MOTE: I think you were saying in the minds of us at the meeting—

THE WITNESS: Well, we knew about the pool of homes in Fulton County. That is the homes that we recruit, study, develop, this kind of thing. And we had already looked there, and we knew there was no suitable white or black homes. There were both black and white homes approved and waiting for children, but none that we thought met Timmy's other needs.

So we didn't feel like we had a home in Fulton, and we knew we would have to ask the State. And we've had a number of mixed race children lately, and we haven't gotten but one white home that I know of in a long time for a mixed race child. That was a home studied by Child Service and Family Counseling, and then we've had one mixed marriage home, you know, available in the county that we could have looked at for Timmy, which we did, I believe. So we already, you know, had some awareness of what the supply of homes available for him were. The supply didn't include any white homes that we knew of." (Emphasis added.)

Finally, Brenda Payne, whose re-evaluation recommendation was that the Drum-monds be permitted to adopt Timmy, and who was present at the staffing, testified at the trial:

"Q. Did you interview the Drummonds in connection with their desire to adopt a child by the name of Timmy?

A. Yes.

Q. Did you also participate in a staff meeting in November in which the question was considered?

A. Yes.

Q. I hand you Plaintiff's Exhibit 15 and direct your attention to the paragraph numbered seven.

A. Yes.

Q. In the second paragraph there, it says: 'After discussion, the staff was convinced if we left him in his present environment, we would be giving him problems he would not have if placed in a black home.'

A. I've lost where that is. Where would that be?

Q. Excuse me. The second paragraph under number seven.

A. At present Timmy is so young? Oh, I see. Okay.

Q. And then it goes on to say: 'A vote was taken, and it was a group decision that it would not be in Timmy's best interest to leave him in the Drummond home and that we would begin immediately searching' —is that what that is—'and'—

A. Immediately to—I don't know. 'Seek' maybe? 'Seek,' maybe, an appropriate—

Q. Search immediately for an appropriate black adoptive home; is that correct?

A. Yes.

Q. Okay. Was that the decision at that meeting?

A. Yes. That the Drummonds would not adopt Timmy.

Q. What about that you would seek a black adoptive home?

A. I believe that was the decision."

The Drummonds were not present at the "staffing" of November 21. No physician or psychiatrist was present. The Drummonds were not given an opportunity to present any statements or evidence and there is no indication that they were put on notice of the basis on which the decision might rest. Of course, it is apparent from the face of the documents that no findings of fact were made as to any of the possible grounds of challenging their qualifications as adoptive parents, i. e., on account of being foster parents, being older than desirable, or not being in good health or of limited intellectual capacity. It is apparent that they were attempting at all times to resist only the possible removal of Timmy to a black family or home, because of his being a mixed race child.

As indicated already, it is impossible to determine precisely what authoritative tribunal or responsible official actually made the decision and, of course, it follows that it is impossible to tell the basis on which the decision was made. The record clearly establishes two elements that could not have provided an automatic basis for disqualifying the Drummonds. These two elements, which were discussed by the parties at the trial and are added as make-weights on appeal in an effort to support the action of the Department, are the mere fact that the Drummonds were foster parents and the fact, standing alone, that Mrs. Drummond at the time of the staffing was 51 years of age and her husband was 39. The record clearly eliminates these factors as automatically excluding the Drummonds from consideration in view of the consistent pattern by which the participants repeatedly stated, after all of the facts with respect to the Drummonds' age and their status as foster parents were fully known, that they were given full consideration as adoptive parents by the Department. This is not to say that in passing on the qualifications of the Drummonds as adoptive parents those responsible for making the decision could not take into consideration the actual age of the persons involved. It merely excludes the age factor and the somewhat discussed policy of discouraging adoptions by foster parents as automatic grounds for justifying the denial of the Drummonds' application.

We have outlined as fully as we have the record facts not in order to weigh them and determine whether they would have warranted the proper officials from arriving at the same ultimate decision as announced by Mrs. Dallinger to the Drummonds after the staffing. We have given these facts to show the substance back of the plaintiff's contention that they were deprived of what they describe as the right to parentage under the theory that a close familial attachment to Timmy with the consent of the defendants over a period of two years created a protectable interest in the relationship under the Fourteenth Amendment to the Constitution of the United States. The recitation also shows the substantial nature of the equal protection claim of the Drummonds, that is to say that even if they should concede that they had not acquired any protectable interest in their family relationship with Timmy, they, nevertheless have been denied equal protection of the laws as guaranteed by the Fourteenth Amendment, because they were not permitted to compete equally for the adoption of this mixed race child because, as they allege, the defendants denied their request for adoption arbitrarily because of their race.

In the ensuing trial in the district court in which the Drummonds urged their contentions, the court, without dealing specifically with the due process claim, concluded that the decision of the defendants did not violate either the plaintiffs' § 1983 or constitutional rights.[3]

**3.** The court's verbal order follows:

"THE COURT: All right, I'll rule for the defendants. This case comes to the Court on a complaint, the crux of which is that the defendant's refusal to place said child with plaintiffs for adoption, based solely on racial grounds, is an unconstitutional denial of equal protection of the laws and an unlawful violation of the civil rights of the plaintiffs.

Therefore, the issue before the Court is to determine whether the decision of the Department of Fulton County Department of Family

Following denial of their claim by the district court, the Drummonds filed a suit in the Superior Court of Fulton County, in which they alleged a denial of their rights as foster parents without a due process hearing and also alleged denial of their rights under the equal protection clause of the Fourteenth Amendment. That court dismissed the suit and the Georgia Supreme Court has affirmed, *Drummond et al. v. Fulton Co. Dept. of Family & Children Services et al.*, 237 Ga. 449, 228 S.E.2d 839 (1976). In its decision, the Georgia Supreme Court discussed the Drummonds' contention as follows:

"The Drummonds next urge that any application of the 'best interests of the child' rule necessarily implies some de

facto rights arising from the psychological dependency of a parent-child relationship which has been sustained over a period of time. Plaintiffs' expert witnesses testified to the trauma of separating a young child such as Timmy from the only parents he has ever known at an age when the separation could not adequately be understood or explained to him. *See* Alternatives to Parental Right in Child Custody Disputes Involving Third Parties, 73 Yale L.J. 15 (1963).

The best interest of the child test has been adopted in many jurisdictions. (citations omitted). This rule contemplates a presumption that the best interests of the child lie with the natural parent, but that this presumption may be rebutted by

and Children Services was one solely based upon the impermissible criteria of race, or whether the race, to the extent that it entered into the decision, was only that legitimate consideration thereof which is—which the Court holds necessarily as required in determining the proper placement of a child.

It is obvious that race did enter into the decision of the Department. The Court has read from beginning to end each of the exhibits which have been submitted by the Plaintiff, some of which throw considerable light on the question, particularly the question, particularly Plaintiff's Exhibit 15, if I'm not mistaken.

THE CLERK: Here is 15, Your Honor.

THE COURT: Which shows just—which, as far as the Court can tell, although there is no date on it, affords a contemporaneous version of the actual decision that took place, and where it is obvious that race did take place, it appears to the Court therefrom that the consideration of race was properly directed to the best interest of the child and was not an automatic-type of thing or of placement, that is, that all blacks go to black families, all whites go to white families, and all mixed children go to black families, which would be prohibited.

In fact, certain statistics indicate that despite the difficulty, despite the difficulty of determining proper homes for mixed race children as is shown by Plaintiff's Exhibit 19, nevertheless, the interrogatories—answers to interrogatories which have been received, show that there have been some placements of mixed race children with white parents.

So, apparently, it is not an automatic-type of placement which the Court holds to have been forbidden. Therefore, the Court feels that the Plaintiff has not made out a prima facie case under Title 42, Section 1983, of the Code of the United States or the Fourteenth Amendment to the Constitution of the United States.

I dissolve the temporary restraining order, refuse to issue the preliminary injunction, and will dismiss the case. I want to say at this point, though, that I am very much afraid from what I have seen in the papers and from the questions which have been asked and so forth that people have been, perhaps, even the plaintiffs here, have been under the impression that this Court has plenary authority with respect to this matter to determine which is the proper or the best home for adoption, that is, to make a choice between the Plaintiff's home and the home of whoever has been selected by the Fulton County Department. That is not the function of this Court at all. If there has been some error in the handling of the case by the Fulton County Department of Family and Children Services, so far as the Court knows, at least the Plaintiff so alleged, it is subject to the Georgia Administrative Procedure Act, in which case the Georgia courts will have authority to determine whether the procedures have been violated. And, perhaps, although the Court does understand that there is a large discretion vested in the Defendant Department, that if there have been any procedural irregularities, the Georgia courts can cure those irregularities. But so far as this Court is concerned, it has had before it the very narrow question of whether the question of race impermissibly entered into the decision of the Defendant Department so as to block the legitimate consideration of factors which ought to have been made by them.

This record, as submitted by Plaintiff, the Plaintiff's case did not show a prima face case, and the Court finds it has no alternative but to dismiss the action and dissolve the injunction, and it will be so ordered. And the Defendants may submit an order within seven days."

clear and convincing evidence to the contrary. *In re Confessora B.*, supra [75 Misc.2d 576, 348 N.Y.S.2d 21].

The Georgia law, however, has not followed this pattern. The best interests of the child test is used only between parents who both have equal right to the child. Code Ann. § 74–107; *Knox v. Knox*, 226 Ga. 619, 176 S.E.2d 712 (1970). Where the dispute is between a natural parent and a third party, on the other hand, the court must award the custody of the child to the parent unless he has lost his parental prerogatives under Code Ann. § 74–108 or is unfit. *Edwards v. Cason*, 237 Ga. 116, 226 S.E.2d 910. (Other citations omitted).

The Drummonds . . . misconstrue the Georgia law in assuming that the best interests of a child rule applies to foster parents. Without this test and its focus on the child, there is no basis for recognizing any right in the 'psychological parents.' Since the focus in determining whether a third party is entitled to custody is on the natural parents and whether or not they have forfeited their rights or are unfit . . . any relationship between the child and his foster parents is primarily irrelevant. *Stuckey v. Jones*, 212 Ga. 495, 93 S.E.2d 719 (1956); *Watkins v. Terrell*, 196 Ga. 651, 27 S.E.2d 329 (1943). . . .

We thus find no merit in the Drummonds' claim of right by virtue of their status as Timmy's foster parents. The trial court did not err, as alleged in Enumeration 3, in denying any legal rights to foster parents who have cared for a child for more than two years and are his psychological parents.

Enumeration of error 7 urging that the trial court erred in holding that the Drummonds were not denied due process or equal protection under the Fourteenth Amendment must also fall under our holding that foster parents have no right to adopt a foster child and thus no right to contest the agency's withholding of consent."

The Georgia Court then dismissed the Drummonds' claim to due process on the theory that their right to adopt a child under Code Annotated Section 74–402 is a "protectable interest" which the Court stated was limited by the principles announced in *Bd. of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The Court then said:

"They in fact were given the right to apply, they were interviewed and the application denied. As we have already noted, the agency's discretion as to which adoptive family will be chosen is absolute and the Drummonds have no rights beyond being considered. Furthermore, the United States Supreme Court has made clear that property interests are defined by state law. *Bd. of Regents v. Roth*, supra. The law of Georgia very clearly provides no rights in foster parents to adopt."

The Court then further concludes:

"We thus find no basis for due process protections in favor of the Drummonds, and the equal protection arguments must also fail for the same reasons."

## II. "LIBERTY" RIGHTS AS REQUIRING DUE PROCESS

As the trial court recognized, a state statute or state policy that every child having mixed black and white parentage could not be adopted by a white family could not be countenanced under the United States Constitution. In *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1966), speaking of a state statute that prohibited the intermarriage of black and white persons, the Court said:

"These statutes also deprive the Lovings of liberty without due process of law in violation of the Due Process Clause of the Fourteenth Amendment. The freedom to marry has long been recognized as one of vital personal rights essential to the orderly pursuit of happiness by free men.

Marriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival. *Skinner v. Oklahoma,*

316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942). See also *Maynard v. Hill*, 125 U.S. 190, 8 S.Ct. 723, 31 L.Ed. 654 (1888). To deny this fundamental freedom on so unsupportable a basis as the racial classifications so directly subversive of the principle of equality at the heart of the Fourteenth Amendment, is surely to deprive all the State's citizens of liberty without due process of law. The Fourteenth Amendment requires that the freedom of choice to marry not be restricted by invidious racial discriminations. Under our Constitution, the freedom to marry, or not marry, a person of another race resides with the individual and cannot be infringed by the State. . . ."

While not as fundamental as the right to marry, the right "to . . . establish a home and bring up children . . ." has been stated in *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), to come within the concept of liberty as guaranteed by the Fourteenth Amendment. While focusing principally on property rights in *Bd. of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1971), the Supreme Court nevertheless discussed the concept of liberty as guaranteed by the Fourteenth Amendment:

" 'While this Court has not attempted to define with exactness the liberty . . guaranteed [by the Fourteenth Amendment], the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . as essential to the orderly pursuant of happiness by free men.' *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042. In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed. See, *e. g., Bolling v. Sharpe*, 347 U.S. 497, 499–500, 74 S.Ct. 693, 694, 98 L.Ed. 884; *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551."

In *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 where an attack was made on the District of Columbia's segregated school system, the Court discussed the interplay of the Fourteenth Amendment's equal protection clause and the Fifth Amendment's due process clause. The Court there said:

"The 'equal protection of the laws' is a more explicit safeguard of prohibited unfairness than 'due process of law,' and, therefore, we do not imply that the two are always interchangeable phrases. But, as this Court has recognized, discrimination may be so unjustifiable as to be violative of due process.[2] (Citing *Detroit Bank v. United States*, 317 U.S. 329, 63 S.Ct. 297, 87 L.Ed. 304; *Currin v. Wallace*, 306 U.S. 1, 13–14, 59 S.Ct. 379, 386, 83 L.Ed. 441; *Steward Machine Co. v. Davis*, 301 U.S. 548, 585, 57 S.Ct. 883, 890, 81 L.Ed. 1279).

Classifications based solely upon race must be scrutinized with particular care, since they are contrary to our traditions and hence constitutionally suspect.[3] (Citing *Korematsu v. United States*, 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194; *Hirabayshi v. United States*, 320 U.S. 81, 100, 63 S.Ct. 1375, 1385, 87 L.Ed. 1774). As long ago as 1896, this Court declared the principle 'that the Constitution of the United States, in its present form, forbids, so far as civil and political rights are concerned, discrimination by the General Government, or by the States, against any citizen because of his race.'[4] (Citing *Gibson v. Mississippi*, 162 U.S. 565, 591, 16 S.Ct. 904, 910, 40 L.Ed. 1075. Cf. *Steele v. Louisville & Nashville R. Co.*, 323 U.S. 192, 198–199, 65 S.Ct. 226, 230, 89 L.Ed. 173). And in *Buchanan v. Warley*, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149, the Court held that a statute which limited the right of a property owner to convey his property to a person of another race was, as an unreasonable discrimination, a denial of due process of law.

Although the Court has not assumed to define 'liberty' with any great precision, that term is not confined to mere freedom from bodily restraint. Liberty under law extends to the full range of conduct which the individual is free to pursue, and it cannot be restricted except for a proper governmental objective. Segregation in public education is not reasonably related to any proper governmental objective, and thus it imposes on Negro children of the District of Columbia a burden that constitutes an arbitrary deprivation of their liberty in violation of the Due Process Clause." 347 U.S. at 499, 74 S.Ct. at 694.

 While it is true, as stated by the Georgia Supreme Court, that property rights that are protectable under the due process clause of the Constitution are generally created by state law, a determination of what is a "liberty" interest has been a matter of federal constitutional law. *Meyer v. Nebraska, supra; Bolling v. Sharpe, supra; Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551. Thus, while this Court recognizes the Georgia Supreme Court's decision that the Drummonds have no "property" interest in their plea to adopt Timmy, arising from their being "psychological parents" of the child, the absence of such right does not foreclose the claim that they have a "liberty" right of which the State cannot deprive them without a due process hearing. It seems clear that a person who seeks to exercise the right enjoyed by all other persons to adopt a child has the same liberty interest to protect as does a person who seeks the right to marry. Neither can be denied or hedged about by arbitrary classifications, nor solely on the basis of race.

## III. EQUAL PROTECTION AND PROCEDURAL DUE PROCESS

Furthermore, the Drummonds claim that even should the Court decide that they have no liberty right to be protected by the due process clause, they nevertheless are entitled to the benefits of the equal protection clause of the Fourteenth Amendment. They say that this right has been denied them because they have been denied the opportunity to adopt a mixed race child because of a rule or policy of the defendant Board that such a child will, as a matter of course, be placed for adoption only with black parents, if available. They say further that whether such policy exists and was the basis for the rejection of their claim to adopt Timmy could not be resolved in the manner in which the defendants acted, but can be determined only after a hearing before an adequate state administrator or tribunal with at least minimal procedural due process.

The defendants contend that the record, which we have attempted to outline above, supports the trial court's determination that the defendants did not use the factor of race impermissibly in denying the Drummonds' right to adopt the child. They further argue that there is no protectable interest under the Fourteenth Amendment of which the state action has deprived them. Thus, they contend that no process is due in the decisionmaking that resulted in their denial. Furthermore, they argue that even though the Drummonds assert that they have been denied equal protection of the laws by reason of an alleged racial policy for excluding the Drummonds with respect to this child, this does not entitle them to any hearing that would meet minimal due process requirements.

 As is already clearly indicated, neither the Drummonds nor Timmy were accorded elemental due process in the proceedings that resulted in the termination of the Drummonds' familial relationship with the child and in his being finally and irreversibly taken away from the only parents he had known during his infancy. It is apparent that such decisions as were made were made ad hoc by discussions, conferences or committee votes without those participating having any established standards for decisionmaking. Moreover, it is perfectly clear that the record now available is strongly suggestive of the fact that the decision was made before the first time the Drummonds were interviewed and that at no time thereafter were they given an op-

portunity to meet any set of required standards either by evidence or other proof. As a result, it is impossible to determine what actual ingredients went into the decision that was finally made to deny the Drummonds the right to adopt the child. The one recurring theme that more than arguably runs throughout the record is the one dealing with race and the desire of the caseworkers and supervisors to explain to the Drummonds *not what other reasons existed for their not being permitted to keep Timmy, but to explain to them why the underlying policy existed*, such policy allegedly being that if a black family was available, a black or mixed race child would be placed with such family rather than with a white family. As we have already noted, such a policy would be impermissible but no one can say with any assurance on this record that any other factor was the basis of the final action taken.

█ █ We have already discussed the existence of a liberty interest in the Drummonds. We now turn to the question whether their contention that they have been denied equal protection of the laws because of the alleged policy of the defendants entitles them to a hearing. This Court has recently held that in the field of state employment, a nontenured teacher is entitled to a due process hearing where he "asserts that he has been dismissed for constitutionally impermissible reasons." The Court held this in a case in which it also decided that such teacher had no such reasonable expectation of employment as would bring him within the rule of *Bd. of Regents v. Roth, supra.* In *Megill v. Bd. of Regents of the State of Florida*, 541 F.2d 1073 (5th Cir.), this Court said:

"With respect to the requirement of a hearing and the adequacy thereof, in *Thaw v. Board of Public Instruction*, 432 F.2d 98, 99 (5th Cir. 1970), this Court stated that a school board is required to provide notice and hearing before dismissing a public schoolteacher or college professor in two types of cases. The first type is when a teacher has tenure or a reasonable expectation of reemployment. *Ferguson v. Thomas*, 430 F.2d 852 (5th Cir. 1970). The second type is when a teacher without tenure or expectancy of reemployment asserts that he has been dismissed for constitutionally impermissible reasons. *Pred v. Board of Public Instruction*, 415 F.2d 851, 856 (5th Cir. 1969). This case falls into the second category."

In *Megill*, the plaintiff first alleged that he was entitled to be rehired as a teacher by the Board of Regents of the State of Florida unless he could be found after a due process hearing to have been denied a position for cause. He also alleged that the actual ground of his failure to be rehired was his expression of opinion and vocal criticism of the institution which would be a denial based upon his exercise of his First Amendment rights. This Court held that because Megill had no form of tenure or right to continued employment beyond the term of his contract he did not have the requisite "property" interest in being rehired upon which to base a claim to constitutional due process. Nevertheless, the Court concluded that since he "assert[ed] that he has been dismissed for constitutionally impermissible reasons" he was entitled to procedural due process.

Here, an allegation that the basis of the defendants' action was the impermissible basis of race may be equated with the assertion in *Megill* of "constitutionally impermissible reasons."

We conclude that it was just not possible for the trial court, here, to determine whether proper criteria were used by the defendants in denying the Drummonds the right of adoption. This follows from the fact that no amount of analysis or explanation of the documents prepared and utilized by the defendants would support a finding of any basis on which they actually decided that the Drummonds were not suitable as adoptive parents. Several possible reasons were suggested by different staff workers at different times. It is clear that the Drummonds knew from the start that foster parents were not normally considered to be desirable as adoptive parents. However, there is no statement or fact finding or

determination that this fact was the basis for the denial. Neither is there any statement to the effect that the Drummonds' age was a basis for the decision. All of this follows, of course, from the fact that no responsible official either made or recorded the actual reasons. The fact that the defendants might have based their action on some fact other than race, cannot be accepted as a substitute for a finding or determination, on a record that is adequate for review, that such cause or causes actually brought about the result.

We conclude that under the law of this Circuit as announced in *Megill*, the Drummonds are entitled to have a hearing with at least some of the elements of procedural due process before they can be bound by a bald determination (which, in fact, was not even made by the defendants here) that no impermissible standards of race controlled their action.[4] Moreover, although it may not have been a basis for decision in *Bolling v. Sharpe, supra*, the Court's language in discussing the two provisions of the Fourteenth Amendment seems to be applicable here. This, we think, is a case in which the alleged "discrimination [is] so unjustifiable as to be violative of due process," 347 U.S. 497, 499, 74 S.Ct. 693, 694.

█ Our determination that the Drummonds have a liberty interest of which they cannot be deprived without a due process hearing is in accord with a judgment of a three-judge district court of the Southern District of New York in *Organization of Foster Families for Equality and Reform v. Dumpson*, D.C., 418 F.Supp. 277.[5]

There were other circumstances in the New York case which do not appear in the case before us. In its disposition of the case on appeal, therefore, the Supreme Court may not reach the precise questions with which we deal here. In the New York cases, the three-judge court was dealing with state statutes and also with a provi-

sion that afforded very substantial elements of procedural due process as to some of the parties in that litigation. Moreover, the problem of racial discrimination was not involved. In view of the need for as prompt action as may be reasonably possible, we consider it not inappropriate to proceed to a judgment in this case without awaiting the action by the Supreme Court in *Smith* and *Shapiro*.

## IV. TIMMY'S RIGHTS

Immediately upon the filing of the order of the district court, Mr. and Mrs. Drummond filed their notice of appeal and filed a motion for an injunction pending appeal, seeking to prohibit the defendants from removing Timmy from their care until the case is disposed of on the merits on appeal. This court denied the injunction, holding that it did not appear that the Drummonds met the strict requirements for a stay pending appeal, that determination having been made apparently largely on the conclusion of the court that at that stage of the proceeding it did not appear that there was a likelihood of their prevailing on the merits on appeal. Nevertheless, the court ordered the case placed on the docket for an expedited hearing and concluded with the following order:

"Therefore, it is further ordered that an attorney shall be appointed to represent the interests of the child Timmy before this Court. *Cf. Organization of Foster Families for Equality & Reform v. Dumpson*, 418 F.Supp. 277 (S.D.N.Y. 1976)."

Pursuant to this order of the court, Alan R. Turem, Esq. was appointed "to represent the interests of the child Timmy before this Court in this case" on July 2, 1976.

Pursuant to that appointment, counsel filed an exhaustive brief undertaking to show wherein Timmy had a critical interest in the outcome of the litigation and that

---

4. The nature of such hearing, while primarily a matter for the administrative officials to provide, will be discussed more fully *infra*.

5. As indicated, the Supreme Court to which a direct appeal, of course, lies from the three-judge court decision, entered an order noting probable jurisdiction on October 12, 1976. *Smith v. Organization of Foster Families for Equality & Reform* and *Shapiro v. Organization of Foster Families for Equality & Reform (probable jurisdiction noted)* —— U.S. ——, 97 S.Ct. 232, 50 L.Ed.2d 164.

such interest was one that might not be adequately vindicated by either the appellants, the Drummonds, or the defendants, the Fulton County Department of Family and Children's Services and individual officials. Counsel also filed a motion with this Court for permission to intervene in the litigation. The merits of this contention have already been recognized by this Court in its order of May 19 which stated: "We also recognize that the interests of the individual who will be most affected by the ultimate decision in this case may not be coextensive with those of either of the former parties."

Timmy's counsel argues that Timmy, as a child, is entitled to Fourteenth Amendment protection generally, despite his essential "ward" status created pursuant to the state's parens patriae power, citing *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). He has also alleged a specific protectable interest under the due process clause of the Fourteenth Amendment. By reference to several Georgia Supreme Court cases, *i. e.*, *Elrod v. Hall Co. Dept. of Family & Children's Services*, 136 Ga.App. 251, 220 S.E.2d 726 (1975) and *In re Levi*, 131 Ga.App. 348, 206 S.E.2d 82 (1974), he confects a "right" which he chooses to denominate a "right to a stable environment." Moreover, the Department's brief seems to recognize the existence of such a right in a child at least up to the time of the legal proceedings which terminate the natural parents' rights to the child. Appellee's brief states:

"The Department recognizes the existence of children's rights . . . and specifically recognizes that Timmy has due process rights involved in the juvenile system."

The apparent difference between the position of the two parties here is that the defendants take the position that due process is afforded such a child as Timmy by the entire "juvenile system" of the State of Georgia which provides that the termination of the parents' rights occurs only in court with full procedural protection and that adoption occurs only in the same manner, that is to say in a court proceeding where full procedural rights are afforded the child. On the other hand, Timmy's counsel contends that at any critical stage of the proceedings between termination and final adoption, procedural due process must exist if, in fact, at such stage Timmy's future life, security and stability are irrevocably changed. Such a stage, they contend, was reached when the defendants undertook to deny permanently and irrevocably the right of the Drummond family, the only parents Timmy knew, the right to adopt the child.

█ It cannot be gainsaid in light of what has already been stated, that Timmy fully meets the requirements of Rule 24(a), F.R.C.P. which provides as follows:

"(a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: . . . (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

In discharging the duties for which he was appointed by this Court, counsel seeks to have this Court permit Timmy's intervention and further seeks to have the trial court's judgment vacated and the case remanded on the ground that the child's rights could not be irrevocably affected by the defendants without a hearing conducted in accordance with the mandates of due process. Thus, the relief sought by both appellants and Timmy coincide on this appeal.[6]

We conclude that Timmy should be permitted to intervene and that this shall be

---

6. The appellants, in addition, seek a reversal of the trial court's determination, and seek a decision by this Court that race played an impermissible part in the action of the defendants.

The absence of a hearing dealing with this issue within the administrative agency makes impossible a decision by us either in favor of the appellants or the appellees on this issue.

accomplished by an order of the trial court on remand, which court will also determine the need of having a guardian ad litem appointed in addition to having counsel represent the child. The trial court shall also determine by order the minimum requirements for the holding of a due process hearing within the administrative agency which will give to all interested parties a full opportunity to be heard, to inquire into the policies, customs and procedures that prevail with regard to a child of Timmy's characteristics and into the qualifications of the foster parents as claimants of the right to adopt Timmy. Optimistically, these parts of the trial court's order can be arrived at by agreement or upon submission of a plan or procedure by the parties.

## V. CONCLUSION

In sum, we conclude that both the foster parents having a close familial relationship during the first years of this child's life and the child himself have a protectable interest under the Fourteenth Amendment which cannot be denied them without due process of law. We also conclude that their contentions that they have been denied equal protection of the laws because their joint familial relationship had been broken by state action solely on account of race requires a due process hearing to determine the truth or falsity of this contention. We also conclude that Timmy has a right to intervene by proper order in the trial court.

The judgment of the trial court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion. The motion by Timmy's counsel for the issuance of this Court's writ of habeas corpus and the motion that this Court hold the original defendants in contempt of court for failure to make the child available to them are DENIED.

The motion for attorney's fees has not been fully briefed and it will be disposed of later.

The mandate of the Court will issue forthwith.

RONEY, Circuit Judge, dissents and will file his opinion later.

RONEY, Circuit Judge, dissenting:

I respectfully dissent. I regret that the press of court business prevented the preparation of this dissent in time for distribution with the majority opinion; and that there has not been even now time to fully develop the premises for this Federal consideration of a state matter so complex.

The majority opinion opens with a question that simply is not asked in this case.[1] The question accurately put is this: may a state agency, charged with the responsibility of placing for adoption a child in its legal custody, take into consideration the race of the child and the race of prospective adoptive parents without violating the Constitution of the United States?

We are not confronted with a statute that makes interracial adoptions illegal, *Compos v. McKeithen,* 341 F.Supp. 264 (E.D.La.1972) (three-judge court); nor with a private adoption in which the state investigatory agency has withheld consent because of race, *see* Ga.Code Ann. § 74–403(4) (1973); nor with a state court decision that an adoption cannot take place because of ethnic origin disparity between a white child and a black stepfather, who was the natural mother's second husband, *see In re Adoption of a Minor,* 97 U.S.App.D.C. 99, 228 F.2d 446, 448 (1955); nor, for that matter, with the question of whether an agency with legal custody of a child can use race as an automatic, and therefore the sole, basis for denying the application of a prospective adoptive parents to adopt a particular child. The finding of fact by the district court that race was not the sole basis for denying the application of the Drummonds for *this* child is not clearly erroneous, and the appellants do not so contend.[2] In fact, the dis-

---

1. The majority opinion states: this appeal presents the question whether the federal courts can give relief to white foster parents who contend that they have been unconstitutionally denied by Georgia state officials the right to adopt a mixed race child solely on account of race.

2. Paragraph 9 of the Complaint states:
 9. Defendants' refusal to place said child with Plaintiffs for adoption, based solely on

trict court viewed the law as prohibiting an automatic-type placement of black with black, white with white or mixed race with black. Because the record does not support the application by the agency of an automatic rule, no question as to automatic standards is before us for review.

The record does support the fact that race was taken into consideration in a rather substantial way in the agency decision that the child would be better placed in a home other than the plaintiffs'. The question is whether the agency, not acting under the imperative of any law or unyielding automatic rule, but rather in the exercise of its own discretionary concepts of successful child placement, may constitutionally take into consideration as an important factor the race of the child and prospective parents. By the force of its decision, the majority must conclude that such action by a state agency violates the equal protection clause of the United States Constitution. For without that concept upon which to base a § 1983 claim, the plaintiffs have no federal case.

On this narrow point of constitutional law I would affirm the decision of the district court. No interpretation of the Constitution by any case cited to this Court prevents a state child placement agency from looking to the best interests of a child in its custody, as judged by agency determined criteria, in deciding where that child should be placed for permanent adoption. If the agency decides that physical characteristics of prospective adoptive parents in relation to those of the child are important criteria for protecting the best interests of the child, the Constitution does not prevent it. To permit consideration of physical

characteristics necessarily carries with it permission to consider racial characteristics. This record reflects nothing more than a large number of agency and social workers with unquestioned credentials endeavoring to find a permanent family home for Timmy that would be best for him for the rest of his life.

Consider first the due process claims of the Drummonds. The majority concedes that under Georgia law there is no property right of foster parents to adopt their foster child. See Drummond v. Fulton Co., 237 Ga. 449, 228 S.E.2d 839 (1976). The majority then proceeds to ascertain if there is any liberty interest at stake requiring due process protection. It finds such an interest under Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). But Loving involved an individual's liberty interest in choosing whomever he wishes to marry regardless of race. It did not deny an individual's liberty right to refuse to marry someone not of his choosing. Accordingly, if the Drummonds have a liberty right in choosing a prospective adopted child, regardless of race, so, too, does Timmy have a liberty right in choosing the best suitable parents. There is little doubt, now, that a child in Georgia would have a constitutional right to be adopted by parents of any race that he chose. But if it is a true "liberty" interest, he has the right not to be adopted by parents of a given race. And he has a right to exercise that right solely in terms of his own best interests. Because an infant is incapable of exercising that right for himself, however, under Georgia law either the parents who voluntarily give up a child for adoption or the agency given legal custody of a child must exercise that right

racial grounds, is an unconstitutional denial of equal protection of the laws and an unlawful violation of the civil rights of Plaintiffs. District court's verbal order:
"THE COURT: All right, I'll rule for the defendants. This case comes to the Court on a complaint, the crux of which is that the defendant's refusal to place said child with plaintiffs for adoption, based solely on racial grounds, is an unconstitutional denial of equal protection of the laws and an unlawful violation of the civil rights of the plaintiffs.
Therefore, the issue before the Court is to determine whether the decision of the De-

partment of Fulton County Department of Family and Children Services was one solely based upon the impermissible criteria of race, or whether the race, to the extent that it entered into the decision, was only that legitimate consideration thereof which is—which the Court holds necessarily as required in determining the proper placement of a child."
At oral argument before this Court, appellants' attorney conceded that the record would not support a finding that the agency decision was based solely on race.

for him.[3] Thus the reliance on *Loving* to give the Drummonds a due process liberty right in connection with adopting a child must also be extended to give the child, through his natural parents or the state as his legal custodian, a corresponding due process liberty right.

Moreover, to the extent that *Loving* is a due process case, it is a *substantive* due process case, in which a state statutory scheme barring interracial marriages was struck down as being inconsistent with the Fourteenth Amendment. The constitutional basis for the Court's holding was that the freedom of choice to marry, or not to marry, a person of another race resides with the individual and cannot be infringed by invidious racial discriminations imposed by the state. The case was not a *procedural* due process decision. The Supreme Court did not suggest that by some amount of procedural due process, notice, hearings, impartial hearing officers, record and review, *Loving* could have been deprived of the right to marry the one who wanted to marry him. *Loving* is not authority for declaring that foster parents have a due process right to a hearing before a child placed in their care can be removed from their home, or before their application for a particular child, in which the state law gives the foster parents no legal interest, can be refused.

To the extent that the contention is made that the Drummonds are entitled to mini-mal due process before their application for adoption of any child can be denied, in my view, such due process as was due was rendered. The record fully supports the fact that complete consideration was given to the Drummonds' application to adopt Timmy. The agency clearly had no per se rule against placing a black or mixed race child in a white home, as indicated by the fact that it had previously made such a placement and the additional fact that the record shows serious consideration of the Drummonds as adoptive parents. Their application was not dismissed out of hand, or treated arbitrarily. Extensive and long-term investigations were made of the conditions in the Drummonds' home to determine if this type of placement would work in this case. A total of eighteen persons were involved in providing input into what emerged as a group consensus. The Drummonds were not without their partisans in the decisive meeting. The ultimate decision was not made in an informational vacuum. The social workers who made the decision about Timmy and the Drummonds were more intimately acquainted with them, their past history and any potential problems, than any hearing officer could ever be. I think that this form of rational decision making is all that is required. Due process does not mean the kind of adversarial hearing with which courts are so familiar. The factors that must be weighed in deciding if a mixed race child could have a

---

**3.** Under Georgia law, once the parental rights of a child's biological parents have been terminated, substantial authority is provided to the agency which assumes the care of the child. Ga.Code Ann. § 24A–3204 (1976) provides that: "If, upon entering an order terminating the parental rights of a parent, there is no parent having parental rights, the court shall commit the child to the custody of the Division of Children and Youth or a licensed child-placing agency, . . . .. The custodian has authority to consent to the adoption of the child, his marriage, his enlistment in the armed forces of the United States and surgical and other medical treatment for the child." Supplementing these powers are the further rights of the custodian set out in Ga.Code Ann. § 24A–2901 (1976): "A custodian to whom legal custody has been given by the court under this Code [Title 24A] has the right to physical custody of the child, the right to determine the nature of the care and treatment of the child, including ordinary medical care and the right and duty to provide for the care, protection, training, and education, and the physical, mental and moral welfare of the child, . . . .." Georgia is not alone in this delegation of full parental powers to an agency which has been awarded custody of a child. *See e.g.,* Fla.Stat.Ann. § 63.052 (Supp. 1976); Miss.Code.Ann. § 93–15–9 (1972). This is consistent with the general rule that where the natural parents of a child are unfit, the state may assume custody of the child, 59 Am.Jur.2d, *Parent and Child* § 39 (1971), with custody being defined as "the sum of parental rights with respect to the rearing of a child including his care. It includes the right to the child's services and earnings, and the right to direct his activities and make decisions regarding his care and control, education, health and religion." 59 Am.Jur.2d, *Parent and Child* § 25 (1971).

successful life in a particular white home are so complex and ephemeral that adversarial procedures are inappropriate.

The case-worker system of social service established by the state for the processing of these very difficult personal and social decisions should not be destroyed under a constitutional edict. Limitations of time, money and human resources may well dictate the methodology of the state agency, but as long as all legal interests of the parties are reasonably protected, the state procedure is not subject to constitutional supervision.

The attorney appointed by this Court to represent Timmy on this appeal argues that Timmy is entitled to a due process hearing upon any change in foster home care regardless of the Drummonds' interest. The suggestion that such a position is supported by *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), and *McKeiver v. Pennsylvania,* 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), is misplaced. In each of those cases and their progeny, the children involved had run afoul of the laws of the state, laws in which the state had an enforcement interest. The rights of the juvenile were in conflict with the state interest in enforcing its own laws. Such due process cases are inapplicable to a case such as this, where the state interest in finding the best home for Timmy coincides perfectly with his interest. Some adult must make the decision for him. Nothing here has shown that an adult court-appointed guardian ad litem and an attorney of his own could better protect this interest than the mechanism which has been established by the state. Certainly a difference, if one

exists, does not support a declaration that one is constitutional and the other not. Whether the record made before the state agency suits the needs of a federal judiciary, which has no general authority for review and no supervisory powers over the operation of the agency, should be irrelevant.

The other area in which the majority finds entitlement to a hearing is the equal protection clause. Relying on *Megill v. Bd. of Regents of the State of Florida,* 541 F.2d 1073 (5th Cir. 1976), the majority finds a right to a hearing in that the decision against allowing the Drummonds to adopt Timmy was made for constitutionally impermissible reasons, to wit, racial matching of parent and child. The majority concludes that it is impossible to ascertain just what factors were used in reaching the decision but, because constitutionally impermissible ones might have been decisive, the Drummonds are therefore entitled to a hearing.

Reliance on *Megill,* however, necessitates adherence to the fundamental proposition asserted by appellants that race cannot be used as a substantial factor in the agency's placement decision. The Drummonds would be entitled to a hearing under *Megill* only if the use of race as one of several factors is constitutionally impermissible. I do not think that it is. As one court has already noted, "we regard the difficulties inherent in interracial adoption as justifying consideration of race as a relevant factor in adoption, . . ." *Compos v. McKeithen,* 341 F.Supp. 264, 266 (E.D.La. 1972) (three-judge court).[4]

---

4. The controversy in the social service world is well documented. In an effort to find permanent homes for all children, particularly the thousands of homeless black and mixed race children, many adoption agencies and social workers have encouraged transracial adoptions as a solution to this most urgent problem. Chastang, *The Dilemma of Biracial Adoption,* 17 Social Work 100 (May 1972); Jones, *On Transracial Adoption of Black Children,* 51 Child Welfare 156 (March 1972). Transracial adoptions began in the early 1950s and increased in volume during the 1960s. Grow & Shapiro, Black Children-White Parents 1 (1974). Despite their growing popularity,

transracial adoptions have been very controversial and are regarded by some as only a second-best alternative, and by others as not a viable alternative at all, in light of today's social realities. *See* Klibanoff, Let's Talk About Adoption 119–121 (1973); Chastang, *supra;* Jones, *supra.* In the spring of 1972, at its first annual convention, the National Association of Black Social Workers expressed its "vehement opposition to the practice of placing black children with white families." Grow & Shapiro, *supra,* at 5. The Child Welfare League of America, although emphasizing that inracial placement is preferable since "in today's social climate, children placed in adoptive families

This case is an unusually difficult one because the legal problems it poses are fraught with emotional overtones. The Drummonds are admirable people. They grew to love Timmy and bestowed upon him the care and warmth so needed by young children. They exemplified the highest goals of foster home care. But foster home care and permanent adoptive homes serve different functions for children. The qualities for one may differ considerably from the qualities for another. After extensive investigation and deliberation, the agency charged with protecting Timmy's welfare ultimately concluded that the interests of Timmy would be best served by placing him permanently in another adoptive home. The question before us is not whether that decision was correct. *Cf. Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Tragic as the agency's considered decision was for the Drummonds, I would hold that it did not deprive the Drummonds of any protectable Federal interest. I would affirm the judgment of the district court.

### ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

Before BROWN, Chief Judge, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, MORGAN, CLARK, RONEY, GEE, TJOFLAT, HILL and FAY, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

with similar racial characteristics can become more easily integrated into the average family group and community," *CWLA Standards for Adoption Service* 92 (revised 1973), undertook to study a sample of transracial adoptions and found "apparent success" in the large majority. *See* Grow & Shapiro, *supra*. The relative degree of success, however, depended on many variables, including among others the parents' attitude, the size of the family, the parents'

IT IS ORDERED that the cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.

occupations, the motivation for adoption, the child's intellectual level, the community's characteristics, which tend to indicate the important role the agency must play in weighing these factors when placing a black or mixed race child in a white home. *See* Grossman, *A Child of a Different Color: Race as a Factor in Adoption and Custody Proceedings*, 17 Buffalo L.Rev. 303 (1968).