**Robert George DRUMMOND and Mildred Pauline Drummond, Plaintiffs-Appellants,**

v.

**FULTON COUNTY DEPARTMENT OF FAMILY & CHILDREN'S SERVICES et al., Defendants-Appellees.**

No. 76–1888.

United States Court of Appeals, Fifth Circuit.

Nov. 28, 1977.

---

Margie Pitts Hames, Neil Bradley, Atlanta, Ga., for plaintiffs-appellants.

Robert L. Mote, Daniel S. Reinhardt, Carol A. Cosgrove, Atlanta, Ga., for defendants-appellees.

Alan R. Turem, Atlanta, Ga. (Court-appointed), Andrew R. Krischner, Atlanta, Ga., Special Counsel for Interest of Child Timmy.

Before BROWN, Chief Judge, and TUTTLE, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, MORGAN, CLARK, RONEY, GEE, TJOFLAT, HILL and FAY, Circuit Judges.

RONEY, Circuit Judge:

Plaintiffs, Robert and Mildred Drummond, a white couple, acted as state-designated foster parents of a mixed race child for over two years. When the defendant state adoption agency decided to remove the child for permanent placement in another home, plaintiffs commenced this action under 42 U.S.C.A. § 1983. Alleging denial of their rights under both the equal protection and the due process clauses of the Fourteenth Amendment, they sought preliminary and permanent injunctive relief, which was denied by the district court. Although a panel of this Court reversed, *Drummond v. Fulton County Department of Family & Children's Services*, 547 F.2d 835 (5th Cir. 1977), the full Court finds no deprivation of constitutional rights and affirms the dismissal of plaintiffs' complaint.

Initially, the *en banc* Court adopts the discussion, reasoning and result contained in the dissenting opinion to the panel decision in this matter as the correct statement of the law in this case. That opinion is reported in 547 F.2d at 857–861. We further address the issues here, however, in view of the oral argument before the full Court, a subsequent case decided by the United States Supreme Court, and supplemental briefs filed with this Court.

The factual background of this dispute is set out in full in Judge Tuttle's thorough opinion for the panel which considered this case. 547 F.2d 835–857. A brief recapitulation will suffice to place the following discussion in context.

In December 1973 in an emergency situation, a one-month-old mixed race child named Timmy was placed for temporary care in the home of Mr. and Mrs. Drummond by the Fulton County children's service agency. Lengthy proceedings were commenced to determine whether the child should be permanently removed from his natural mother's custody and placed for adoption.

Within a year, the Drummonds had become sufficiently attached to Timmy to request permission to adopt him. The Drummonds had not signed an agreement that they would not try to adopt their foster child, as is common practice with many placement agencies. Although the level of care provided by them as foster parents had consistently been rated excellent, there was an emerging consensus within the defendant child placement agency charged with Timmy's care that it would be best to look elsewhere for a permanent adoptive home. When this was explained to the Drum-

monds in March 1975 they appeared to acquiesce. By August of that year, however, they had renewed their request to adopt Timmy.

The child was not legally freed for adoption by the Georgia courts until September 1975. Because this signaled the end of any attempt to return Timmy to his natural mother, the agency began a more focused consideration of what ultimate placement would be best for Timmy. After a number of discussions with the Drummonds, a final decision-making meeting was held in November 1975 with 19 agency employees present. Although the Drummonds were not present at this meeting, caseworkers who had dealt with them during the past two years did attend. As a result of that meeting a final agency decision was made to remove Timmy from the Drummond home and to deny the Drummonds' adoption application. It is clear that the race of the Drummonds and of Timmy and the racial attitudes of the parties were given substantial weight in coming to this conclusion. The agency employees were also aware that as Timmy grew older he would retain the characteristics of his black father. A few months later the plaintiffs filed suit.

■ A hearing on the request for a preliminary injunction was scheduled for January 23, 1976, nine days after the suit was begun. During that period some discovery was conducted by the parties. At the beginning of the hearing, the trial court consolidated the hearing on the preliminary injunction with a trial on the merits, pursuant to its discretionary powers under Fed.R. Civ.P. 65(a)(2).

Although cited as error on appeal, the consolidation represented a responsible exercise of judicial discretion in view of the essentially legal nature of the contest and the need for prompt action on this case. See generally 7 Moore's Federal Practice ¶ 65.04[4] (2d ed. 1975).

After hearing six witnesses and arguments of counsel the court, by verbal order, dismissed the complaint on the merits. In rendering that decision, the court made the following finding:

It is obvious that race did enter into the decision of the Department. . . . [I]t appears to the Court . . . that the consideration of race was properly directed to the best interest of the child and was not an automatic-type of thing or of placement, that is, that all blacks go to black families, all whites go to white families, and all mixed children go to black families, which would be prohibited.

On appeal counsel was appointed to represent Timmy's separate interest in this litigation.

The case as now presented to the en banc Court formulates four major issues for resolution: (1) did the action of the defendant constitute a denial of equal protection; (2) do the Drummonds have a protected liberty or property right in their relationship with Timmy; (3) does Timmy have such a right; and (4) if such rights exist, how much procedural protection is required in order to safeguard them?

## I.

The Drummonds and counsel for Timmy contend that the state denied them equal protection of the laws because of the extent to which race was considered in making the adoption decision. Although the complaint alleged that race was the sole determining factor, the district court found that this was not the case, and the finding was not clearly erroneous. The argument has thus centered on the question of whether a state agency, charged with the responsibility of placing for adoption a child in its custody, may take into consideration the race of the child and the race of the prospective adoptive parents without violating the equal protection clause of the United States Constitution.

■ The manner in which race was considered in this case frames the precise issue before us. The district court found that race was not used in an automatic fashion. The Drummonds' application was not automatically rejected on racial grounds. This finding may not be dis-

turbed here because not clearly erroneous. Fed.R.Civ.P. 52(a); *United States v. United States Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948). But can race be taken into account, perhaps decisively if it is the factor which tips the balance between two potential families, where it is not used automatically? We conclude, as did another court which grappled with the problem, that "the difficulties inherent in interracial adoption" justify the consideration of "race as a relevant factor in adoption, . . ." *Compos v. McKeithen*, 341 F.Supp. 264, 266 (E.D.La.1972) (three-judge court).

■ In this regard, the Supreme Court has recently provided some guidance. It appears that even if government activity has a racially disproportionate impact, the impact alone does not sustain a claim of racial discrimination. "Proof of racially discriminatory intent or purpose is required to show a violation . . . ." *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). There has been no suggestion before this Court that the defendants had any purposes other than to act in the best interest of the child when it considered race. Furthermore, the Supreme Court has recently stated in the sensitive area of voting apportionment that the consideration of race is not impermissible. *United Jewish Organizations of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977). As the plurality opinion in that case remarks, where race is considered in a nondiscriminatory fashion and there is "no racial slur or stigma with respect to whites or any other race," there is no discrimination violative of the Fourteenth Amendment. 430 U.S. at 165, 97 S.Ct. at 1009.

In concluding that there has been no denial of equal protection in these circumstances, we note the following factors.

First, consideration of race in the child placement process suggests no racial slur or stigma in connection with any race. It is a natural thing for children to be raised by parents of their same ethnic background.

Second, no case has been cited to the Court suggesting that it is impermissible to consider race in adoption placement. The only cases which have addressed this problem indicate that, while the automatic use of race is barred, the use of race as one of the factors in making the ultimate decision is legitimate. *In re Adoption of a Minor*, 97 U.S.App.D.C. 99, 101, 228 F.2d 446, 448 (1955); *Compos v. McKeithen*, 341 F.Supp. 264, 266 (E.D.La.1972).

■ Third, the professional literature on the subject of transracial child placement stresses the importance of considering the racial attitudes of potential parents. The constitutional strictures against racial discrimination are not mandates to ignore the accumulated experience of unbiased professionals. A couple has no right to adopt a child it is not equipped to rear, and according to the professional literature race bears directly on that inquiry. From the child's perspective, the consideration of race is simply another facet of finding him the best possible home. Rather than eliminating certain categories of homes from consideration it avoids the potentially tragic possibility of placing a child in a home with parents who will not be able to cope with the child's problems.

Fourth, in the analogous inquiry over the permissibility of considering the religion of would-be adoptive parents, numerous courts have found no constitutional infirmity. *See generally*, Annot. *Religion as a Factor in Adoption*, 48 A.L.R.3d 383 (1973). Those cases make the same distinction as this Court makes in the racial context. So long as religion is not an automatic factor, its consideration as one of a number of factors is unobjectionable.

Finally, adoption agencies quite frequently try to place a child where he can most easily become a normal family member. The duplication of his natural biological environment is a part of that program. Such factors as age, hair color, eye color and facial features of parents and child are considered in reaching a decision. This flows from the belief that a child and adoptive parents can best adjust to a normal family relationship if the child is placed with adop-

tive parents who could have actually parented him. To permit consideration of physical characteristics necessarily carries with it permission to consider racial characteristics. This Court does not have the professional expertise to assess the wisdom of that type of inquiry, but it is our province to conclude, as we do today, that the use of race as one of those factors is not unconstitutional.

## II.

■ In order to make out a claim of deprivation of Fourteenth Amendment due process rights a plaintiff must demonstrate first, that he has been deprived of liberty or property in the constitutional sense, and second, that the procedure used to deprive him of that interest was constitutionally deficient. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

### A.

The Drummonds assert two possible constitutional liberty and property interests. The first involves a concept which plaintiffs have denominated the "psychological family"; the second, a stigma to their reputation alleged to accrue upon the rejection by the agency of their application to adopt Timmy.

■ Plaintiffs maintain that during the period Timmy lived with them mutual feelings of love and dependence developed which are analogous to those found in most biological families. By so characterizing their home situation they seek to come within the protection which courts have afforded to the family unit. They assert that their relationship to Timmy is part of the familial right to privacy which is a protected interest under the Fourteenth Amendment. *See, e. g., Griswold v. Connecticut*, 381 U.S. 479, 485, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). As the "psychological parents" of Timmy, they claim entitlement to the parental rights referred to in numerous decisions. *See, e. g., Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Stanley v. Illinois*, 405 U.S. 645, 92

S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

The argument that foster parents possess such a protected interest was placed squarely before, and discussed by, the Supreme Court in its recent decision in *Smith v. Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) [hereinafter *OFFER*]. Although the Supreme Court did not find it necessary to resolve whether such an interest exists, Justice Brennan's discussion of that claim is helpful to our analysis. He first considered the elements which have traditionally been thought to define the concept of "family." Of course, the Court recognized that "the importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association." Nonetheless, the Court then noted several differences between foster and natural families, particularly the fact that the foster parent relationship has its genesis in state law, unlike the biological relationship, and that with foster parents there is often a natural parent seeking to assert a competing liberty interest.

We conclude that there is no such constitutionally protected interest in the context of this case. An understanding of the role of the foster parent in a child placement helps make this conclusion plain. In the search for adoptive parents, thorough investigations are made so that long range considerations may be given substantial weight. Ga.Code Ann. §§ 74–409, 74–410 (Supp.1976). Potential adoptive parents are evaluated forward in the full family context through a child's adulthood, marriage, offspring, and backward to the "adoptive" grandparents, uncles, aunts, and cousins. The attitudes of other family members are examined. In short, the goal is to duplicate the relationship that most persons have with their natural parents during their entire lives.

The Georgia Department of Human Resources has promulgated an Adoption Services Manual which sets forth the philosophy it uses in finding adoptive parents. The manual states:

Adoption services are focused on meeting the needs of children by securing for them permanent families. Some children who need parents are infants; many are older children; some have physical, intellectual and emotional handicaps; some are children of minority groups; others are children of mixed heritage. A permanent home or plan is the right of every child. Inherent in the process of finding parents for children is the recognition that children have certain basic needs. The philosophy of the Division is to seek for children who need adoptive homes parents who are emotionally and physically capable of assuming the responsibility of parenthood and who are flexible enough to accept them for their intrinsic worth.

■ During this process in Georgia, children are placed in foster homes as an alternative to institutional care for what is clearly designed as a transitional phase in the child's life. Ga.Code Ann. § 24A–1403 (1976). Foster parents are thus considered only on the basis of the quality of temporary care they can be expected to provide. Therefore, in the eyes of the state, which creates the foster relationship, the relationship is considered temporary at the outset and gives rise to no state created rights in the foster parents. *Drummond v. Fulton County Department of Family & Children Services*, 237 Ga. 449, 228 S.E.2d 839 (1976). As Justice Stewart remarked in his concurring opinion in *OFFER*, "any case where the foster parents had assumed the emotional role of the child's natural parents would represent not a triumph of the system, to be constitutionally safeguarded from state intrusion, but a failure." 431 U.S. at 861, 97 S.Ct. at 2119.

■ Here, the only time potential parents could assert a liberty interest as psychological parents would be when they had developed precisely the relationship which state law warns against the the foster context. As Justice Stewart goes on to say in *OFFER*, it is hard to "believe that such breakdowns of the . . . system must be protected or forever frozen in their existence by the Due Process Clause of the Fourteenth Amendment." 431 U.S. at 862, 97 S.Ct. at 2119. There is no basis in the Georgia law, which creates the foster relationship, for a justifiable expectation that the relationship will be left undisturbed. *Cf. Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). True liberty rights do not flow from state laws, which can be repealed by action of the legislature. Unlike property rights they have a more stable source in our notions of intrinsic human rights. The very fact that the relationship before us is a creature of state law, as well as the fact that it has never been recognized as equivalent to either the natural family or the adoptive family by any court, demonstrates that it is not a protected liberty interest, but an interest limited by the very laws which create it. *See Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

It needs noting that this conclusion does not necessarily control every "foster family" situation, but only those in which a child placement agency charged with the custody of a child, places that child for temporary care. Other situations will have to be addressed on a case by case basis.

■ The plaintiffs assert a second liberty interest in an attempt to bring themselves within the ambit of recently decided due process cases. They claim that the decision to deny them the right to adopt Timmy and to remove him from their home casts a stigma upon their reputation. They assert they satisfy all requirements which have been judicially imposed to make out a constitutional claim for harm to reputation.

In order to implicate such an interest, plaintiffs must demonstrate first that they have been denied a right previously recognized by the state in conjunction with a defamatory finding about them. *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). Second, they must

challenge this finding as factually inaccurate. *Codd v. Velger*, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977). Finally, there must be publication of the defamation outside the context of litigation. *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). Although the plaintiffs have tried to satisfy each of these tests, they have not shown any liberty interest in "reputation-plus" which requires procedural due process.

■ First, the findings about the plaintiffs are not those which can be considered defamatory. In *Paul* the plaintiff was accused of being a shoplifter, in *Codd* of attempting suicide, and in *Bishop* of insubordination and "conduct unsuited to an officer." These are all allegations which might have had collateral effects when those plaintiffs sought employment, and are allegations which, if false, might have given rise to state law defamation actions. Here, the sole finding about the Drummonds is that in the judgment of the agency, they are not the best available parents for Timmy, at least in part for a reason beyond their control, *i.e.*, their race. Their treatment of Timmy as foster parents was spoken of in glowing terms. It would thus seem there has been no defamation at all.

Second, although the Drummonds challenge the ultimate conclusion that they would not be the most suitable adoptive parents for Timmy, they have not alleged any particular factual errors in the agency's information or findings. They are in fact white, and the agency had an accurate picture of their age, health, education and other relevant data. Absent some indication that they would be able to "clear their names" at a hearing, they are not invoking a protected interest. *Codd, supra.*

Finally, the information upon which the agency acted was never made public until this litigation. It is normal for foster children to eventually be removed from foster homes. Nothing publicly occurred which would cast any aspersion upon the Drummonds. Nor could the agency action in any way affect the Drummonds' attempt to adopt other children in the future.

Thus we conclude that the Drummonds have no protectable liberty interest in this case.

## B.

■ Independent counsel for Timmy claims a liberty right personal to Timmy which he asserts must be dealt with in constitutional due process terms. The interest upon which he bases this claim is one which he has chosen to call the "right to a stable environment." He argues that a child has a liberty right not to be moved from home to home, without a prior hearing, particularly in light of the significant literature which indicates a traumatic effect of such moves on young children. Counsel insists this right exists regardless of whether the child is in a natural, adoptive or foster setting and in all other temporary care situations.

Due to the novelty of this contention, counsel cites no authority in support of such stability interest. He relies on cases such as *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), and *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), for the proposition that a juvenile's "status" cannot be changed without procedural due process. In those cases, however, a protected liberty interest was clearly at stake, since the juveniles involved were facing delinquency charges which could have resulted in incarceration. The liberty interest was thus not an interest in a "stable environment," or in not being moved around, but in staying out of jail.

*Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), seems to speak against such an interest as asserted here. There, a state prisoner was transferred from a medium security to a maximum security facility because he was suspected of having started a fire in the first prison. He filed a suit contending that a hearing was required before the transfer. The Court, unable to discern the protected interest involved, denied relief. Notwithstanding the fact that the transfer was motivat-

ed by specific misconduct on the part of the prisoner, and had a clearly punitive purpose and effect, the Court found no liberty interest. Other recent cases have led one author to the analysis that the Supreme Court "has grown increasingly uncomfortable with the concept of open ended and vaguely defined due process interests. It appears to prefer an analysis that is both more concrete as well as more restricted in its application." *The Supreme Court, 1975 Term*, 90 Harv.L. Rev. 56, 102 (1976), There certainly is no concrete or well-defined interest shown by the facts of this case.

Here, the state's motive in interrupting Timmy's environment at any point was always to move him to a place which it considered superior, over the long range, for his particular needs at the time. Since Timmy can point to no source for a right in conflict with that state program, we hold that Timmy has no liberty interest as asserted here. This decision by its facts is necessarily applicable only to an infant of tender years placed in a foster home for the length of time and under the circumstances here involved. We cannot by decision here address every conceivable situation, in some of which a child may have acquired some interest, as alluded to in Justice Brennan's opinion in *OFFER*.

### III.

In *OFFER* the Supreme Court assumed *arguendo* the existence of a protected liberty interest, and then proceeded to test the New York child placement scheme against the strictures of due process. It was able to do this because the extensive procedural safeguards incorporated into the New York scheme were ultimately found sufficient protection for a liberty interest of any magnitude. The holding of *OFFER*, therefore, is that whatever the strength of the protected interest, New York provided adequate safeguards.

This Court is unable to follow that approach in this case. It cannot be gainsaid that the Georgia mechanism for removing a child from a foster home is much more informal and much less "judicial" than the New York model. Of course, *OFFER* does not mandate the New York model as constitutionally necessary in every case. Nonetheless we face a scheme which is admittedly less rigorous in its procedural trappings. Thus, we have been required to face head on and resolve the question which was the subject of the Supreme Court's assumption. In doing so we have concluded that there is no liberty interest here of full-fledged constitutional magnitude.

 *OFFER* itself, however, by pretermitting the question of the existence of a protected interest, leaves open the possibility that some such an interest might exist. Although no liberty interest of substantial magnitude is present in the instant situation, some might find a lesser interest in these facts deserving of some protection against arbitrary conduct. We thus consider whether the procedures afforded in Georgia were adequate to protect whatever interest might be at stake. The nature of the Georgia procedures is set out in detail in the panel opinions reported in 547 F.2d 835. Of course, "[t]he required degree of procedural safeguards varies directly with the importance of the private interest affected and the need for and usefulness of the particular safeguard in the given circumstances and inversely with the burden and any other adverse consequences of affording it." Friendly, *Some Kind of Hearing*, 123 U.Pa.L.Rev. 1267, 1278 (1975). *See also Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 How. (59 U.S.) 272, 280, 15 L.Ed. 372 (1855). The Fourteenth Amendment is not so inflexible as to require a trial-type hearing for every interest felt worthy of protection. Nor is the Georgia scheme to be measured against New York's, since *OFFER* in no sense elevates the New York scheme into a constitutional standard.

### IV.

██ To the extent there may be some undefined interest in this case that could not be treated by the state arbitrarily, we note that the process afforded by defendants was sufficient to comport with the

Fourteenth Amendment mandate in connection with such interest.

■ It has been frequently stressed that the requirements of due process are flexible and vary with time and circumstances. *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Cafeteria Workers v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). Quite recently, the Supreme Court articulated the test to be used in determining what process is due in any particular circumstance. That test requires consideration of (1) the private interest at stake; (2) the risk of erroneous decisions under the present procedure and the improvement in decision making which would flow from additional procedural safeguards; and (3) the governmental interest involved. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

Applying this test to the case at bar reveals that the procedures currently in use strike a constitutionally adequate compromise. The private interest here is presumably the privacy, reputation, and stability concerns discussed above, the interest flowing from the love, affection and concern developed between the Drummonds and Timmy.

The agency decision in this case to be made under any procedural format, as all concede, is "what placement is in the best interest of the child?" The subsidiary inquiries which must be addressed in deciding this question are complex and numerous. The present procedure is designed to maximize information in answering these questions. Several interviews were had with the foster parents. The child was observed and tested mentally and medically. Data was collected about the child's natural mother and father. Persons trained in various skills, including psychology and social work are involved in the process. Informality was used to elicit spontaneous and accurate responses to sensitive inquiries. In sum, the present system seems designed to obtain the most accurate answer possible to the ultimate difficult question and the risk of error is minimized. There has been no indication that additional or more accurate information could be produced at a more structured trial-type hearing that would lead to a superior decision about Timmy's placement. The reason is obvious. In most hearing situations, the question to be resolved is one of fact. Here, however, the ultimate question is essentially one of policy. Child placing is an art, not a science that can be computerized to follow rigid rules. The "best" home for Timmy is basically a subjective determination. Should intellectual opportunity be stressed over financial or athletic opportunity? Is a rural setting preferable to the city? What age should his adoptive parents be? In what order of the social structure? Should a given child be placed with older siblings, younger siblings or no siblings? The questions could go on for pages. These questions are policy inquiries, not factual disputes. The utility of a hearing in such a situation is doubtful. As one commentator has noted,

> [t]rials are at their best when specific adjudicative facts are in dispute. Trials are seldom desirable either on legislative facts or on broad factual issues. That a plaintiff has a protected interest at stake does not mean that he is entitled to a trial, because an issue appropriate for trial may be absent.

K. Davis, *Administrative Law of the Seventies* § 7.00–11 at 276 (1976).

Finally, we consider the Government's interest. The Government desires, of course, to act consistently with the child's best interest. Its additional concern, however, is to move as efficiently as possible. Children in foster care are a state expense, while those in adoptive homes are generally not. Sometimes extreme haste is necessary in an emergency to place a child in foster care. The quicker a child can be placed in a permanent home, the better. The presence of additional procedural safeguards and appeals procedures would naturally slow the placement process down to the detriment of both child and state.

Given the nature of the interests at stake, and the inquiry involved, as well as the overwhelming need for flexibility in this

situation and the complexity of the decision to be made, this Court holds that whatever process was due was rendered by the state agency in this case.

AFFIRMED.

JOHN R. BROWN, Chief Judge, concurring:

While I agree with the views expressed by Judge Roney and concur fully in the result and opinion, I feel that some comment is warranted focusing on the practicalities and realities of the unfortunate situation which confronts us.

Assuming the Drummonds have any protectible liberty interest which triggers the due process clause of the Fourteenth Amendment, I believe the record in this case amply demonstrates that, whatever due process rights the Drummonds had, those rights were more than adequately safeguarded.

First, the record shows that those charged with the awesome responsibility of Timmy's best interest were concerned, sensitive and sincere professionals.[1] Second, there can be no doubt that the Drummonds had notice, at least by March 17, 1975, that placement outside their home was a very real possibility. Third, the Drummonds *were heard.* The record establishes that the Drummonds personally met with various case workers on at least three occasions: March 10, August 25, and October 4, 1975.[2] Fourth, the notes of the October 4 "evaluation interview" conducted by Brenda B. Payne,[3] Plaintiff's Exhibit 14, *recommending that the Drummonds be allowed to adopt Timmy*, were given to each person present at the November 21 staffing and Mrs. Payne read those notes aloud as her "recommendation." Payne Deposition at 30. Thus, it cannot be said that the Drummonds' interests were not represented at that meeting. While no formal adjudicato-

ry hearing was held, what, as a practical matter, could have been accomplished by such a hearing in view of what had happened before the staffing? My answer to this question is "Nothing."

As to the equal protection contention, it is abundantly clear to me that no violation occurred. The notes of Ms. Payne's "evaluation interview" alone should be dispositive on this score. Factors other than race were indisputably taken into account: The Drummonds' tendency to be overprotective, their intellectual capacities, and their age. Moreover, the "[m]ain topics of discussion" at the November 21 staffing (see Plaintiff's Exhibit 15) numbered seven: age, health, community setting, involvement of extended family, parenting abilities, intellectual environment, and race.

As to the last of these topics, not only do I agree with Judge Roney's conclusion that race may be considered as "a" factor in adoptions without violating the equal protection clause, but I would state that as a practical matter, it *should be* so considered. Indeed, adoption personnel would be blinking at reality if they failed to consider the race of the adoptive parents vis-à-vis the child. I would also go so far as to state that they could give substantial weight to race as a factor—including consideration of such things as the geographical location and area attitudes involved—without treading dangerously on equal protection rights. Indeed, agency personnel, without violating the Fourteenth Amendment, could expressly declare that the racial difference between the child and the "adoptive" parents was the primary reason for making the child placement decision. Granted that society and the community should not harbor attitudes against interracial mixture, the subject of the foster home placement and even adoption is the child, whose life will be affected by community values and preju-

---

1. For example, the notes of the November 21, 1975, "staffing" at which the final decision was made to place Timmy elsewhere, state in pertinent part: "The discussion lasted approximately three hours and the group consensus not to allow the Drummonds to adopt Timmy *was carefully thought out and personally painful for*

*all those present.*" Plaintiff's Exhibit 15, p. 1; emphasis added.

2. See 547 F.2d at 838–46.

3. Quoted in full at 547 F.2d at 843–46.

1212

dices as they exist, not what they ought to be.

Lastly, it would be unwise, and to my mind, an arrogation of power for Federal Judges to voyage into the supersensitive realm of state adoption matters. To set standards as the dissent would require sounds easy. But inevitably that process involves policy choices which go to the heart of the welfare of the child, probably for the rest of the child's life. On what do we draw in making these choices? Are we, as Federal Judges, endowed with sufficient prescience to decide such delicate issues? We should remind ourselves that we do not possess the wisdom of Solomon and that Timmy's adoption is not as blissfully simple as cutting the baby in half.

GODBOLD, Circuit Judge, concurring in part.

I concur with parts I, II and III of the opinion of the en banc court. I believe that if there was a protectible interest at stake the procedures followed by the State of Georgia were not constitutionally adequate, therefore I am not able to join in part IV of the opinion.

TUTTLE, Circuit Judge, with whom GOLDBERG, Circuit Judge, joins, dissenting:

With deference, I dissent. Believing as I do that the Supreme Court opinion in *Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977), strongly supports the conclusion expressed in the panel opinion of this Court that both the Drummonds and Timmy have a "liberty" right in their foster family relationship which cannot be destroyed by the state without a due process hearing, I consider it necessary to dissent from the Court's opinion.

## I. THE "LIBERTY" INTEREST OF THE DRUMMONDS

The *OFFER* case arose from a contest between the natural mother of a child and foster parents who had had continuous cus-

tody of the child for a considerable period of time. The New York statute specifically addressed the problem that was presented when such a contest arose. As described in the Court's opinion in *OFFER*:

"Soc.Serv.L. § 383(2), *supra*, n. 3, provides that the 'authorized agency placing out or boarding [a foster] child . . . may in its discretion remove such child from the home where placed or boarded.' Administrative regulations implement this provision. The agency is required, except in emergencies, to notify the foster parents in writing 10 days in advance of any removal. 18 N.Y.C.R.R. § 450.-10(a). The notice advises the foster parents that if they object to the child's removal they may request a 'conference' with the social services department. *Ibid.* The department schedules requested conferences within 10 days of the receipt of the request. 18 N.Y.C.R.R. § 450.10(b). The foster parent may appear with counsel at the conference, where he will 'be advised of the reasons [for the removal of the child], and be afforded an opportunity to submit reasons why the child should not be removed.' 18 N.Y.C.R.R. § 450.10(a). The official must render a decision in writing within five days after the close of the conference, and send notice of his decision to the foster parents and the agency. 18 N.Y.C.R.R. § 450.10(c). The proposed removal is stayed pending the outcome of the conference. 18 N.Y.C.R.R. § 450.-10(d).

If the child is removed after the conference, the foster parent may appeal to the department of social services for a 'fair hearing,' that is a full adversary administrative hearing, under Soc.Serv.L. § 400, the determination of which is subject to judicial review under N.Y.C.P.L.R. Art. 78; however, the removal is not automatically stayed pending the hearing and judicial review. (Footnotes omitted)."
*Ibid.* 431 U.S. 829, 97 S.Ct. 2102–03.

Furthermore, the Supreme Court opinion referred to an additional "pre-removal procedural safeguard." The Court said:

"In other words, § 392 provides a mechanism whereby a foster parent may obtain pre-removal judicial review of an agency's decision to remove a child who has been in foster care for 18 months or more."

*Ibid.*[1] 431 U.S. 882, 97 S.Ct. 2104.

Notwithstanding these provisions of the New York law, the three-judge district court enjoined a removal in the *OFFER* case without additional procedural safeguards, the court having found those provided by statute were insufficient.

The Supreme Court reversed the judgment of the three-judge court, not by saying that the foster parents did not have a protectable interest under the Constitution, but because it found "that 'narrower grounds exist to support' our reversal." The Court stated:

"We are persuaded that, even on the assumption that appellees have a protected 'liberty interest' the district court erred in holding that the pre-removal procedures presently employed by the state are constitutionally defective."

*Ibid.* 431 U.S. 847, 97 S.Ct. 2111.

In view of the fact that the State of Georgia has *no* "preremoval procedures" that will fit any concept of due process, a subject that will be discussed later, the case before us demands that a determination be made whether there is such protectable interest in the Drummonds.

As is sometimes the case, I believe that the concurring opinion, joined in by the Chief Justice and two of the Justices, dramatically emphasizes the importance which a majority of the court attributed to the question whether a liberty interest inheres in the relationship between the foster parents and children who have been in their care a substantial period of time. It would have been very simple for the court to have taken the position adopted by the concurring Justices as expressed by Mr. Justice Stewart:

"I cannot understand why the Court thinks itself obliged to decide these cases

on the assumption that either foster parents or foster children in New York have some sort of 'liberty' interest in the continuation of their relationship. (footnote omitted). Rather than tiptoeing around this central issue, I would squarely hold that the interests asserted by the appellees are not of a kind that the due process clause of the Fourteenth Amendment protects."

*Ibid.* 431 U.S. 857, 97 S.Ct. 2116–17.

However, rather than follow this course, the Court took considerable pains to analyze the assertion of the foster parents and foster children that they had a constitutionally protected liberty interest. A careful reading of the opinion indicates to me that but for the existence of the narrower ground in that case and but for the fact that the contest before the court was being waged between foster parents on the one hand and natural parents on the other, the court would readily have determined that such constitutionally protected liberty interest did exist. In the first place, the court recognized that, although "the usual understanding of 'family' implies biological relationships, and most decisions treating the relation between parent and child have stressed this element" and that "a biological relationship is not present in the case of the usual foster family" nevertheless "biological relationships are not exclusive determination of the existence of a family." *Ibid.* 431 U.S. 843, 97 S.Ct. 2109–10. Most telling is the following language from the Court's opinion:

"Thus the importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot[ing] a way of life' through the instruction of children. *Wisconsin v. Yoder,* 406 U.S. 205, 231–233, 92 S.Ct. 1526, 1541–42, 32 L.Ed.2d 15 (1972), as well as from the fact of blood relationship. No one would seriously dispute that a deeply loving and interdependent relationship between an adult and a

1. At the time of removal here, Timmy was over two years old.

child in his or her care may exist even in the absence of blood relationship. (Footnote omitted). At least where a child has been placed in foster care *as an infant has never known his natural parents and has remained continuously for several years* in the care of the same foster parents, it is natural that the foster family should hold the same place in the emotional life of the foster child, and fulfill the same socializing functions, as a natural family. (Footnote omitted). For this reason, we cannot dismiss the foster family as a mere collection of unrelated individuals. *Cf. Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974)." [Emphasis added.] *Ibid.* 431 U.S. 844, 97 S.Ct. 2111.

Following this language, the Court pointed up the distinctions between the foster family and the natural family, particularly in light of the fact that the foster family is a creation of statute and the Court concluded this discussion by saying:

"In this case, the limited recognition accorded to the foster family by the New York statutes and the contracts executed by the foster parents argue against *any but the most limited constitutional 'liberty'.*" [Emphasis added.]

The Court then discussed the posture of the *OFFER* case as being a contest between foster parents and the natural parent of a child. The Court then said:

"It is one thing to say that individuals may acquire a liberty interest against arbitrary governmental interference in the family-like associations into which they are freely entered, even in the absence of biological connection or state law recognition of the relationship. It is quite another to say that one may acquire such an interest in the face of another's constitutionally recognized liberty interest that derives from blood relationship, state law sanction, and basic human right—an interest the foster parent has recognized by contract from the outset. *Whatever liberty interest might otherwise exist in the foster family as an institution* that interest must be substantially

attenuated where the proposed removal from the foster family is to return the child to his natural parents." [Emphasis added.]
*Ibid.* 431 U.S. 846, 97 S.Ct. 2111.

Thus, I think it can confidently be stated that if the Drummonds' case were before the Supreme Court instead of the *OFFER* case and the state law did not provide the elaborate arrangements for a due process hearing, the foster parents would have prevailed in their claim that they had a constitutionally protected liberty interest.

## II. `TIMMY'S "LIBERTY" INTEREST

What has been said respecting the liberty interest of the Drummonds, of course, applies, possibly even more cogently, in the case of the small child whose entire life will be affected in large or small degree by his being taken away from the only parents he has known since his birth. Again, I refer to the language of the Court in *OFFER*:

"At least where a child has been placed in foster care as an infant, has never known his natural parents, and has remained continuously for several years in the care of the same foster parents, [all of which perfectly describes Timmy] it is natural that the foster family should hold the same place in the emotional life of the foster child, and fulfill the same socializing functions as a natural family. (Footnote 52 omitted)."

In footnote 52, the Court, after speaking of the dispute as to the validity of a "psychological parent" theory stated:

"But this case *turns not on the disputed validity of any particular psychological theory, but on the legal consequences of the undisputed fact that the emotional ties between foster parent and foster child are in many cases quite close*, and undoubtedly in some as close as those existing in biological families." [Emphasis added.]
*Ibid.* 431 U.S. 845, 97 S.Ct. 2110.

Moreover, Timmy's case does not rest entirely on my understanding of what the Supreme Court would do if faced with the

precise issue presented by Timmy. It appears that the defendants agree that Timmy has due process rights. The State, in its brief, stated:

"The Department recognizes the existence of children's rights—and specifically recognizes that Timmy had due process rights involved in this juvenile system."

Further, in the appellees' petition for rehearing en banc they stated:

"Defendants have conceded that children have due process rights. However, the scope of those rights is completely a function of the nature of the Government conduct affecting the child. Thus, where a government acts in its *parens patriae* capacity to protect neglected children and assumes the status of guardian, through its qualified agency personnel, the child's rights are protected if the state structures a system designed to accommodate the child's best interest."

As I read this language, it means that the defendants concede that the liberty interest exists, but that the Georgia adoptive system, taken as a whole, affords to Timmy the due process to which he is entitled and that all the process that Timmy is due at any stage of his temporary care, his foster family relationship and their terminations, the termination of parents' rights, and final adoption is that "the state structures a system *designed* to accommodate the child's best interest." In other words, appellees say that as long as the legislature decides in its wisdom that everything relating to an abandoned child's welfare and status can safely be left to the uncontrolled and unreviewable discretion of state and county employees that satisfies all due process requirements. This would include the action taken here by which the defendants seek to terminate irrevocably a relationship which the Supreme Court has, in the passages quoted above, recognized as parallel to that of a biological family, without any opportunity of the child to be heard. In any event, it appears to be a concession by the state

that Timmy has a protectable interest. The question whether this interest can be taken away from him by the sort of proceedings had here is discussed below.

## III. WHAT PROCESS IS DUE?

The ad hoc nature of the steps that finally led to a committee decision to remove Timmy from the Drummonds' custody and to "begin immediately to look for an appropriate black adoptive home" is fully set out in the panel opinion of this Court at 547 F.2d 835 (5th Cir. 1977). As fully disclosed in that opinion, in March 1976, a "staffing" of four caseworkers or supervisors, none of whom had either seen the Drummonds or Timmy at that time, concluded ex parte that the Drummonds should be told that Timmy was to be taken from their care and "that it would be in Timmy's best interest to be adopted by a black couple." Bearing in mind that this decision was made before any of the persons involved had seen the Drummonds and before the several investigations and studies of the Drummonds as potential adoptive parents were made,[2] it is obvious, it seems to me; that Mrs. Dallinger's effort to analyze at the trial what was meant by the action taken at the staffing is an afterthought, because the only purpose for approaching the Drummonds was to explain to them that the child was to be removed and awarded to black adoptive parents. I comment on this only because the decision on whether the procedures followed provided minimal due process must necessarily depend upon when the decision was made. Miss Osgood's statement that the question was raised "that if the Drummonds were not amenable to our plan, would we move Timmy to a black foster home feeling that, you know, it would be better if we were going to have him adopted by a black couple, to have him in a black foster home if there was going to be any length of time before he was free" clearly indicates that "our plan" was that "we were going to have him adopted by a black

---

2. It is to be noted again here that each of the investigations resulted in fulsome praise of the Drummonds' relationship with the child.

couple." It seems apparent that this was the decision because the undisputed testimony of Mrs. Drummond following the final "consensus" was that Mrs. Dallinger said to Mr. and Mrs. Drummond: "I am sure that you are both very anxious to know what has happened and we called you in to tell you that the *decision* still stands, that we feel that Timmy will be better off adopted by a black couple or a black family." [Emphasis added]. Of course, the only "decision" that Mrs. Dallinger could have referred to is the decision made at the March staffing which I have discussed above. I suppose no one would claim that if the Drummonds and Timmy are entitled to any process at all they had received it by the time this decision was made.

However, the matter did not end after the March meeting between the caseworkers and the Drummonds. The latter protested and requested a reconsideration. They were put off by statements that no action would be taken until after Timmy's mother's rights had been terminated by the Juvenile Court. This was done in September, and in the meantime, several inquiries and studies were made by caseworkers or other officials of the defendant Department, most of which discussed the merits, pro and con, of the relationship between Timmy and his foster parents.[3] Finally, without giving the Drummonds an opportunity to be present and without their having been notified of the standards by which the relationship would be judged, a group meeting of 19 employees of the Department was called to obtain a "consensus" as to what should be done with Timmy in relation to his foster parents.

A written report of this meeting states in its last paragraph:

"A vote was taken and it was a group decision that it would not be in Timmy's best interest to leave him in the Drummonds' home, and that we would begin immediately to look for an appropriate black adoptive home. Although this was a difficult decision it was felt that Timmy's long range best interest must be the focus."

The Drummonds were not present at the staffing of November 21. No physician or psychiatrist was present. There is no record of any testimony or statement made by any person present, except that we can assume that the documents heretofore referred to were available to the members of the group. The Drummonds were not given an opportunity to present any statements or evidence, much less to be represented by counsel or to present witnesses supporting their position nor were they given any notice of the basis on which the decision might rest. Of course, it is apparent from the face of the documents that no findings of fact were made as to any of the possible grounds of challenging their qualifications as adoptive parents. It is apparent from the record that they were attempting at all times merely to resist the removal of Timmy on the only ground which was explained to them, that is that it was the plan for "this type" of child to be adopted by black parents. It follows, of course, that it is impossible to tell the basis on which the decision was made, since no findings of fact were made. The trial court did not deal with the due process claim asserted by the Drummonds. Timmy's separate claim of the right to due process was not presented, because he was not separately represented in the trial court.

I, of course, agree with the conclusion in the Court's opinion that the kind of a hearing that is mandated by the due process clause varies according to the particular interests that are sought to be protected and the adverse effect a requirement of a hearing would have on the governmental interest involved. However, one of the principal reasons why I feel it necessary to note my dissent to this opinion is the conclusion stated in the final paragraph:

"Given the nature of the interest at stake, and the inquiry involved, as well as

---

**3.** It should be noted again that most of these reports were extravagant in their praise of the manner in which the Drummonds had developed a genuine loving family with this child. See 547 F.2d 835.

the overwhelming need for flexibility in this situation and the complexity of the decision to be made, this Court holds that whatever process was due was rendered by the state agency in this case."

I sincerely believe that this statement trivializes due process beyond recognition. In the Supreme Court decision, *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18, the Court found that its prior decisions indicated that identification of the specific dictates of due process "generally requires consideration of three distinct factors:

"[F]irst, the private interest that will be affected by the official action; second the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. See, e.g., *Goldberg v. Kelly, supra*, 397 U.S. 254, at 263–271, 90 S.Ct. 1011, 25 L.Ed.2d 287."

In that case, which was the complaint of a disabled worker that prior to the termination of Social Security disability benefit payments the recipient must be afforded an opportunity for an evidentiary hearing, the Court found that he was not entitled to such a hearing because of the elaborate procedural provisions under the statute and regulations, saying:

"Information regarding the recipient's current condition is also obtained from his sources of medical treatment DISM, § 353.4. If there is a conflict between the information provided by the beneficiary and that obtained from medical sources such as his physician, or between two sources of treatment, the agency may arrange for an examination by an independent consulting physician. *Ibid.* Whenever the agency's tentative assessment of the beneficiary's condition differs from his own assessment, the beneficiary is informed that benefits may be terminated, provided a summary of the evidence upon which the proposed determination to terminate is based, and afforded an opportunity to review the medical reports and other evidence in his case file. He also may respond in writing and submit additional evidence. *Id.* § 353.6.

The state agency then makes its final determination, which is reviewed by an examiner in the SSA Bureau of Disability Insurance. 42 U.S.C. § 421(c); CM §§ 6701(b), (c). If, as is usually the case, the SSA accepts the agency determination it notifies the recipient in writing, informing him of the reasons for the decision, and of his right to seek *de novo* reconsideration by the state agency. 20 CFR §§ 404.907, 404.909 (1975). Upon acceptance by the SSA, benefits are terminated effective two months after the month in which medical recovery is found to have occurred. 42 U.S.C. § 423(a) (1970 ed. Supp. III).

If the recipient seeks reconsideration by the state agency and the determination is adverse, the SSA reviews the reconsideration determination and notifies the recipient of the decision. He then has a right to an evidentiary hearing before an SSA administrative law judge. 20 CFR §§ 404.917, 404.927 (1975). The hearing is non-adversary, and the SSA is not represented by counsel. As to all prior and subsequent stages of the administrative process, however, the claimant may be represented by counsel or other spokesmen. § 404.934. If this hearing results in an adverse decision, the claimant is entitled to request discretionary review by the SSA Appeals Council, § 404.945, and finally may obtain judicial review. 42 U.S.C. § 405(g); 20 CFR § 404.951 (1975).

Should it be determined at any point after termination of benefits, that the claimant's disability extended beyond the date of cessation initially established, the worker is entitled to retroactive payments. 42 U.S.C. § 404. Cf. § 423(b); 20 CFR §§ 404.501, 404.503, 404.504 (1975). If, on the other hand, a beneficiary re-

ceives any payments to which he is later determined not to be entitled, the statute authorizes the Secretary to attempt to recoup these funds in specified circumstances. 42 U.S.C. § 404. (Footnotes omitted)."

424 U.S. at 338, 339, 96 S.Ct. at 904–05.

By contrast, there is no statute and there are no regulations that cover the requirements which must be complied with by the Department before a relationship such as that enjoyed by the Drummonds and Timmy is terminated. In actual practice, moreover, there was nothing to compare with the provision described in the margin that "whenever the agency's tentative assessment of the beneficiary's condition differs from his own assessment, the beneficiary is informed that benefits may be terminated, *provided a summary of the evidence upon which the proposed determination to terminate is based, and afforded an opportunity to review the medical reports and other evidence in his case file*" nor was there anything remotely resembling the opportunity given, as described by the Supreme Court in its opinion which says "he also may respond in writing and submit additional evidence."

In the *Mathews* case, as the Supreme Court noted, the final determination by the agency is then "reviewed by an examiner in the SSA Bureau of Disability Insurance." 42 U.S.C. § 421(c); CM §§ 6701(b), (c) (footnote omitted). If, as is usually the case, the SSA accepts the agency determination, it notifies the recipient in writing *informing him of the reasons for the decision, and of his right to seek de novo reconsideration by the state agency.* . . ." 424 U.S. at 338, 96 S.Ct. at 904. [Emphasis added.]

All this is then followed if the recipient seeks reconsideration, by a federal appeal and an evidentiary hearing before an administrative law judge, as pointed out in the margin. In contrast, there is nothing in the Georgia law that permits any review, appeal or reconsideration by any tribunal or official or court of the "consensus judgment" made by this ad hoc committee.

The only kind of judicial review available is by the filing of a complaint in the United States Court where, as happened in this case, the district court had before it only an imperfect documentary record and the testimony of several of the actors in the proceeding who undertook to speak for the entire group of 19 and to explain what they had in their mind when they finally terminated Timmy's only known family relationship.

Of course, prominent in the Court's discussion in the *Mathews* case is the kind of harm that might result by the official action, together with the risk that such harm would occur through the procedures used, together with the probable value of additional procedural safeguards. Here, all evidence of the case indicated the agreement of all concerned that a breakup of this family unit would be a traumatic experience for the child. Furthermore, whereas the *Mathews* case dealt with money which could be recouped if the decision turned out, to be erroneous, what is dealt with here is the child's whole life, for the termination will undoubtedly govern Timmy's whole life, optimistically for good, but, if erroneous, for harm.

As to the governmental burdens which would result from granting of minimal due process, there is nothing in the record that indicates that any substantial number of foster parents seek to actually establish a close family relationship with an infant or child of tender years and then seek to become adoptive parents. Any requirement of due process should certainly not extend beyond those who wish to have some such procedures followed if they find themselves in the same position with respect to a foster child as are the Drummonds. The administrative procedures would thus appear not to present any formidable state burden.

Although the court in *Mathews* was dealing with a property interest, I think its description of the Supreme Court's prior efforts to define due process is apposite here. The Court said:

"The 'right to be heard before being condemned to suffer grievous loss of any

kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.' *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 168, 71 S.Ct. 624, 646, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). See *Grannis v. Ordean*, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914)."

Whatever took place within the confines of the Department, certainly cannot be thought by anyone to have fallen within any of these definitions. Probably the worst aspect of the matter is that under the law as announced by the Court here, absolute and final discretion is allowed to the Department.

I know of no other situation under our laws in which the whole future life of a child of tender years can be gravely affected by the totally uncontrolled discretion of public officials without an opportunity for a hearing by those affected. I join in the assumption that I am sure underlies the opinion of the Court that the persons involved intended to do what they thought to be for the best of the child in the circumstances, but the law we announce today would deny relief to persons equally affected even though a strong showing could be made that the persons acting had done so capriciously, venally, or from definite racial bias, because the opinion says that the proceedings which produced the result in Timmy's case were adequate to satisfy the requirements of due process.

### IV. THE RACIAL QUESTION

The complaint alleged that the action of the defendants in removing Timmy from custody of the Drummonds was motivated solely on racial grounds, that is it was done pursuant to a policy that black or part black children could not be placed for adoption with a white couple. One of the great defects in the proceeding here is the fact it is utterly impossible to determine whether or not this allegation is true. A careful reading of the documentary and oral testimony introduced at the trial gives me a strong belief that the decision made by the four or five workers in March to tell the Drummonds that they must give up Timmy so that he can be raised by a black couple was the one and only basis for all of the proceedings and the result that issued therefrom. In any event, there was no record, there was no transcript of testimony, there is no indication that any word about other reasons than Timmy's race went into any decision-making or was the basis for the final decision.

The fact that this problem could not be resolved by the trial court on the record before it, as I firmly believe, adds much to my feeling of the necessity of having a much more adequate hearing procedure before such issues can be disposed of administratively.

What I have said up to this point is meant to indicate that I believe that both the Drummonds and Timmy have been denied a liberty right without due process, entirely without respect to the question of race. I simply add that when the question of whether the Department of Family and Children's Services has a policy that, if available, only black parents may adopt black or mixed-race children is still unresolved because of the deficiency in the proceedings then the facts cry out for a different kind of hearing before the administrative body. This is necessary in order that there can be a proper review, if not administratively within the state, then in the federal court where such issues are cognizable.

I would adhere to the mandate issued following the panel opinion of this Court.